HEARNSBERGER *v.* McGAUGHEY.

4-9394                                          239 S. W. 2d 17

Opinion delivered March 12, 1951.

Rehearing denied May 28, 1951.

664

*Purifoy & Purifoy,* for appellant.

*L. B. Smead* and *J. Bruce Streett,* for appellee.

GRIFFIN SMITH, Chief Justice. In December, 1948, Gladys McGaughey was severely injured when Frank McGaughey's automobile in which she was riding was struck by a truck driven by Ellis Ford. The complaint sought $70,000 to compensate severe personal injuries and other losses. From a judgment for $13,600 the defendants have appealed.

Mrs. McGaughey is a registered nurse who because of former injuries had temporarily abandoned her profession. Her husband, Jack McGaughey, has been dead for some time, and appellee resides with Frank McGaughey, who was Jack's uncle.

In December, 1948, appellee resumed work on a part-time basis, earning $7 per day. When the collision resulting in this appeal occurred, appellee was being driven in Frank McGaughey's car on Highway 79, southwesterly. Seven miles from Camden a side-road or cut-off intersects Highway 79 northeast of Buena Vista. Ford, driving for Ellis Graham with several other Negroes, was taking a truck of pulpwood to the International Paper Company's Mill at Camden. There was substantial testimony for the jury's finding that Ford was traveling at a high rate of speed and struck the McGaughey car on appellee's side of the road. This determination was not contrary to physical facts and was responsive to testimony that placed the truck over the median line. We can not say as a matter of law that Ford's negligence did not cause the collision, or that appellee's conduct was a contributing factor.

The most perplexing phase of the controversy involves the relationship between H. G. Hearnsberger and Graham. The paper company did business with several procurers of raw material, assigning territory to each. Hearnsberger was one upon whom the company depended. Weekly price lists, specifications, etc., would be sent out by the mill, indicating the quantity of wood desired and the price to be paid. The offer to buy specified delivery at Camden by rail or truck. Four such dealers were on the mill's list in December, 1948.

Graham, who owned a truck, was frequently engaged by Hearnsberger to haul pulpwood. There was no testimony contradicting Graham's assertion that he employed his own men when Hearnsberger assigned to him a designated task, nor is it shown that Hearnsberger told any of the employes how the work was to be done, thereby supervising means and methods touching physical operations. In this respect the general principles discussed in *Moore and Chicago Mill & Lumber Co.* v. *Phillips,* 197 Ark. 131, 120 S. W. 2d 722, are applicable. It was there said that even though control [with the right of] direction be retained by the owner [or employer], the relationship of master and servant is not destroyed unless such control involves the physical conduct of the contractor in the performance of the work "with respect to the details thereof." While we adhere to the rules expressly affirmed in that case, the factual situation here is different in that the pulpwood cut at Graham's direction was taken from a tract of land formerly owned by Homer Ingram of Pine Bluff. The right to take pulpwood from the land was conveyed to Hearnsberger October 20, 1948, when Ingram delivered his deed to all pine measuring eight inches and above, at the stump, together with any such smaller timber the grantee might need in removing the primary purchase from the land. The consideration was $835, cash.

Hearnsberger testified that on October 25th—five days after receiving the timber deed—he sold the property to Ellis Graham and thereby divested himself of all interest in the subject-matter, and that he paid Graham

$11.50 per cord for the pulpwood delivered at the International mill. While Ingram's deed to Hearnsberger permits the pine to be taken, Hearnsberger's deed to Graham recites fee simple ownership, and the price was the same that Hearnsberger had paid Ingram, "$835 in cash, the receipt of which is hereby acknowledged." This language was followed by a conveyance of the pine timber. But in the deed to Graham, Hearnsberger retained "such possession of said land, at all times, as shall not interfere with [Graham's] rights under this deed for the purpose aforesaid." Mildred Thomas was employed by the First National Bank of Fordyce and Hearnsberger was chairman of the board of directors. Miss Thomas, a notary public, identified her signature to Hearnsberger's acknowledgment and testified that the deed was executed the day of its date—October 25th. It was not recorded.

It thus appears *prima facie,* that ownership of the timber passed to Graham for the same amount Hearnsberger had paid, although testimony disclosed that cash was not paid, and the deed does not recite retention of a lien. Mill tickets showing receipt of the wood for credit purposes listed Hearnsberger as owner of the land from which the cutting originated; and, while the information may have been given the mill superintendent by Ford or Graham, it is conceded that Hearnsberger expected to recoup through payments made to Graham.

The mere fact that Hearnsberger was treated as owner of the land would not be sufficient to sustain a finding that as between Graham and Hearnsberger the relationship of independent contractor and employer did not exist, but it is a circumstance carrying weight when considered with Graham's ownership of the truck that featured in the wreck. It had been bought in June, 1948, for something in excess of $800 with a down payment of $200. Having ascertained that pulpwood-hauling was profitable, the truck owner employed three other Negroes to assist with the work. He did not know Hearnsberger when the purchase was made. Mechanical repairs and other expenses were his independent obligations. But,

said Graham, "I paid for gasoline out of the wages I made with this truck." Here, again, is language indicating employment, and while it may be true that legal niceties—such as the difference between independent contractor and master and servant—should not be dealt with in a manner imputing to Graham an understanding of technicalities, yet the jury that heard him and observed his demeanor might have inferred that use of the term *wages* was an inadvertence revealing more than its casual use in other circumstances might suggest.

After the collision Hearnsberger formed a corporation called Southern Pulpwood Co., completing it February 14, 1949. In the meantime Ingram had complained that timber substantially smaller than the deed of October 20th called for had been cut. Ingram had formerly resided in Ouachita county near Buena Vista, not far from the land sold to Hearnsberger.[1] After ascertaining that undersize timber had been cut, Ingram called Hearnsberger at Fordyce by telephone, and later received two letters. During the telephone conversation Hearnsberger told Ingram he thought $200 asked for the undersize cutting was excessive—"that I was a little high in my estimate of the trees." Hearnsberger also told Ingram he had lost money on each tract—"including the one described in Graham's deed."

The first letter, dated April 22, 1949, was on the printed stationery of "H. G. Hearnsberger — Railroad Ties, Logs, and Pulpwood." It merely informed the claimant that Hearnsberger had been down to look over "that timber." Ingram was invited to come to Fordyce for a personal conference. In his second letter, April 28, 1949, Hearnsberger expressed regret that Ingram would not meet him at Buena Vista "so that we could look over the tract together." Hearnsberger then mentioned the number of stumps he had counted, saying, "I was sorry to see even this small number [of undersized trees] cut against your specifications. However, I can very easily see how it was done by knowing the general intelligence

[1] When Hearnsberger bought the timber on the 60 acres sold to Graham for $835, he acquired from the same grantor another tract, or rather the timber on it, paying in all $1,860.

of the Negro cutter, . . . even though each one had been cautioned that your job was to have been cut to eight inches instead of the six inches they cut to on most other jobs. Each one was provided with an eight-inch measure, *and they were supervised by one of our best men.*" [2] The claim was settled for $175.

When Hearnsberger was asked why his name appeared on the paper company's tickets issued to Graham he explained that at times the company's requirements were large; that he bought from several independent sources; that the difference between what he paid those who filled his orders and what he received for the pulpwood was profit, and that delivery information was necessary before he could settle with sellers like Graham. The company's agent in charge of checking deliveries would ask drivers where the wood came from.

It is not denied that the load being hauled by Ford for Graham when the collision occurred came from that part of the Ingram tract sold to Hearnsberger,[3] and that Hearnsberger in discussing erroneous cutting with Ingram said that removal of the timber had been supervised by "one of our best men."

Appellees attach significance to Ingram's testimony, not contradicted, that in April following the December incident, Hearnsberger asserted that he lost money on the Buena Vista tract, notwithstanding the contention that Graham, through installments, had settled for the purchase price, and had also repaid the item of $175 representing Hearnsberger's adjustment with Ingram.

While giving direct testimony regarding his business transactions, Hearnsberger was asked: "During December, 1948, [while] Ellis Graham was selling wood to you f. o. b. the mill, could he also offer to sell to anybody else he wanted to?" A. "Yes, sir." Q. "In short, you didn't have a binding agreement to buy the wood: if [Graham] could purchase it you would take it from him,

[2] Italics supplied.

[3] The load featuring in the collision was the second one Graham took from the Ingram tract December 7th.

or anybody else you could get it from?" A. "That is right."

In explaining the payment of $175 to Ingram, Hearnsberger testified: "I sold this tract of timber to Ellis Graham and made him a deed to it. Under this sale I contract with Graham to buy the pulpwood billets he cut from it. Some of the timber was sawlogs: I didn't buy that—just the pulpwood." Later, in mentioning the pulpwood, Hearnsberger spoke of it as "the part I contracted to buy." The jury could have found that these explanations were inconsistent with the contention that there was no binding agreement to take the pulpwood.

We realize, of course, that witnesses do not always employ appropriate expressions to convey a particular meaning. Here it is possible that Hearnsberger had in mind that his purpose was not to hold Graham to the contract if the owner of the legal title could do better in a different market. But the implication throughout is that in selling to Graham, Hearnsberger expected to receive reimbursement through sale of the pulpwood. The second part of the question directed to Hearnsberger was, of course, broad enough to include wood taken from other land; but, aside from niceties of language and doubt cast by inconclusive statements, the jury could have been perplexed with the two answers; and since the finders of facts are charged with the duty of basing reasonable conclusions upon natural inferences, there was substantial testimony either for or against the collateral issue.

Although as appellate judges we might not question a single affirmative statement or discount any denial Hearnsberger made respecting his dealing with Graham, that is not the issue before us. It is, rather, What substantial testimony did the jury have, with attending circumstances, for finding that this appellant was not referring to Graham when he asserted the timber cutting was supervised "by one of our best men?" The answer must be that there was a question of fact in support of appellee's theory that Graham was Hearnsberger's servant.

No single act in party relationships would be sufficient to overcome the *prima facie* showing that Graham was an independent contractor, but when all are considered it is not reasonable to say that factual substance was lacking. In charging a jury District Judge ROBERT P. DICK of the Western District of North Carolina, (*United States* v. *Searcey*, 26 Fed. 435) said:

"Circumstantial evidence, strictly speaking, consists of a number of disconnected and independent facts, which converge toward the *fact at issue* as a common center. These concurrent and coincident facts are arranged in combination by a mental process of reasoning and inference, enlightened by common observation, experience, and knowledge. When presumptions arise from a number of connected and dependent facts, every fact essential to the series must be proved. Such evidence is like a chain, in which no link must be missing or broken which destroys its continuity. Circumstantial evidence is, like a wire cable, composed of many small associated but independent wires. . . . The strength of the cable depends upon the number of wires which are combined, but some of the wires may be broken, and yet the cable be sufficiently strong to uphold the structure. As no chain is stronger than its weakest link, a chain is less reliable when it has a great number of links, but a wire cable is strengthened by an increase in the number of its wires. This combination of attenuated wires may be stronger than a solid rod of iron of the same size which may have flaws affecting its strength. Where circumstantial evidence consists of a number of independent circumstances, coming from several witnesses and different sources, each of which is consistent and tends to the same conclusion, the probability of the truth of the fact in issue is increased in proportion to the number of such circumstances."

In the case at bar we are not willing to say that the uncontradicted facts, when reinforced with inferences arising from the combination of circumstances, did not present a question for the jury.

Affirmed.