[Civ. No. 22956.   Second Dist., Div. Two.   May 7, 1958.]

GORDON ARMSTRONG COMPANY, INC. (a Corporation), Petitioner, v. SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; DONALD COULTER, a Minor, etc., et al., Real Parties in Interest.

Jarrett & Morgan and Albert J. Holzhauer for Petitioner.

Harold W. Kennedy, County Counsel, and William E. Lamoreaux, Assistant County Counsel, for Respondent.

Raoul D. Magana, Richard J. Collins, Daniel C. Olney and Victor E. Kaplan for Real Parties in Interest.

HERNDON, J.—The sole question presented by this proceeding is whether or not petitioner Gordon Armstrong Company, Inc., a foreign corporation, was "doing business in this State" in such manner and to such extent as to make it amenable to service of process and to the jurisdiction of our superior court.

Petitioner, a corporation organized under the laws of Ohio, is one of two defendants in an action brought in our superior court to recover damages for personal injuries. The plaintiffs are Donald Coulter, an infant, and his father, Fred Coulter. The defendants are the petitioner and St. John's Hospital, a nonprofit corporation organized under the laws of California. The action is based upon injuries sustained by said infant as a result of a fire that occurred on June 22, 1955, in a baby incubator owned by the hospital and manufactured by petitioner. The complaint states causes of action (1) upon breach of an implied warranty of fitness and (2) upon negligence in the manufacture, sale, operation and use of the incubator.

Defendant St. John's Hospital answered the first amended complaint on September 19, 1956. The order for substituted service upon petitioner providing for service upon the Secre-

tary of State and the mailing of the copy of the summons and complaint to petitioner at 1501 Euclid Avenue, Cleveland, Ohio, was dated December 20, 1956.

Petitioner's motion in the trial court to quash and vacate the service of summons was denied on November 25, 1957. Thereafter, and within the time allowed petitioner for the filing of its answer, petitioner filed herein its petition for writ of mandate under section 416.3 of the Code of Civil Procedure.

### THE FACTUAL PRESENTATION

The evidentiary material presented to the trial court upon the motion to quash, and now presented to us in this mandate proceeding, is unusually voluminous. Petitioner's factual showing is contained in two affidavits of its president, Gordon Armstrong, and in an affidavit and a deposition of its attorney, Mr. Jarrett. Plaintiffs filed not less than 11 affidavits in opposition to the motion to quash. Both sides make reference to Mr. Gordon Armstrong's answers to 41 written interrogatories submitted by plaintiffs and filed by them in opposition to the motion to quash. Petitioner has filed a separate bound book of exhibits consisting of photostatic copies of the pleadings, affidavits, depositions and other papers pertinent to the proceedings in the trial court.

(a) *Petitioner's Portrayal of Its California Activities.*

The affidavit of Mr. Gordon Armstrong, petitioner's president, contains the following:

"Affiant states that the Corporation is an Ohio corporation and has only one office anywhere in the world and that is located at Cleveland, Ohio. It is a small corporation and has only nine (9) employees, including the officers of the corporation. It has no salesmen anywhere. It sells by mail only and never takes orders within the State of California. Its officers and employees are not stationed in the State of California, nor have they ever solicited or accepted any orders in the State of California, nor has the corporation at any time ever had any salesmen in the State of California even at medical conventions. No person has been hired, engaged or employed by the corporation as a salesman or representative for the State of California, nor has any person been designated by the corporation as a salesman, sales agent, dealer, agent, distributor, or representative of any kind or nature, nor even an independent contractor, of the corporation in or for the State of California. That the corporation has no sales office in the State of California, nor any other

office in the said State. No display rooms or show rooms are maintained in the State of California. The corporation maintains no telephone directory listing or other listing in the State of California; has no bank accounts in the State of California; maintains no listing of the corporation on any office door or directory in the said State of California. The corporation does not own, lease or possess any warehouses or warehousing or storage facilities or any real or personal property in the State of California, nor does it distribute any samples in the State of California.

"Affiant states that whenever any California buyer of the corporation's products sends his order to the corporation, it is accepted at Cleveland, Ohio, and the corporation sells directly to the buyer, F.O.B., Cleveland, Ohio. The orders are received at the Cleveland, Ohio office, are accepted there, and the products are shipped from the State of Ohio, and payment is made to the corporation at its Cleveland, Ohio address."

Petitioner alleges that with certain exceptions, hereafter noted, its contacts with California residents have been solely through the medium of the mails and other media of interstate communication, that its sole method of soliciting sales in California has been through advertising in magazines with national circulation and direct mail advertising conducted on a national basis.

Petitioner admits certain additional California contacts which it describes as "occasional and sporadic." These consist of attendance at certain national or regional conventions of hospital associations held in California in 1953, 1954, and 1955. At these conventions petitioner's incubators were exhibited and explained by certain of its executives. Petitioner testified that it did not make any sales, or attempt to make any sales, during the course of these conventions.

Petitioner also admits that in 1953 Miss Leslie Jones, field assistant to the president, spent 18 days in California checking service of a new model of equipment previously sold to certain California hospitals, and she also attended medical conventions in California in 1954. Mr. and Mrs. Gordon Armstrong attended the hospital conventions in 1953, 1954, and 1955, accompanied by Mr. Jay Dorsak, the latter holding the title of vice-president in charge of engineering. Mr. and Mrs. Armstrong also made courtesy calls on certain business clients on two other occasions while in California on vacation or en route to Hawaii. The hospital conventions above referred to usually continued from three to five days.

(b) *Plaintiffs' Version of Petitioner's California Contacts.*

Plaintiffs' affidavits present the following facts in support of their contention that Armstrong's contacts with California, and California residents, are more than sufficient to satisfy the minimum requirements of recent decisions to constitute doing business in this state:

(1) Armstrong obtains its business and conducts its solicitation of California business by a continuous and consistent mail campaign directed to all of the major hospitals in California. Numerous examples of the letters are attached to the various affidavits. They describe the product, extol its virtues and solicit orders, urging the prospective customers to write, wire, or telephone their orders collect. This type of solicitation has been used for at least the past five or six years, and average in frequency one letter per hospital per month.

(2) Armstrong advertises extensively, frequently and continuously in numerous periodicals which are received by most of the hospitals operating in California.

(3) Armstrong has followed the policy of reserving and contracting for space for the purpose of displaying its products at hospital association conventions for the purpose of soliciting orders, contacting purchasing agents of hospitals and building up good will. In connection with the three California conventions attended in 1953, 1954, and 1955, Armstrong spent $5,872.52 on transportation expenses for its officers and employees who attended the conventions and manned the booths. In addition, the sums of $731.34, $1,226.07 and $1,646.63 were incurred for expenses in connection with said convention displays. The foregoing expenses did not include the salaries of the employees and attendants.

(4) Jay Dorsak, vice-president in charge of engineering, visited St. John's Hospital on June 22, 1955 to inspect their incubators. At that time, he inspected the Armstrong incubators at St. John's, made some adjustments thereon, and discussed their safety and engineering features with Sister Mary David of that hospital. He spent three days at the hospital on that occasion.

(5) In November of 1955, Mr. Dorsak conferred for several hours with a Mr. Cornelius Gray, Chief of Engineers of the California Lutheran Hospital, concerning suggested improvements that could be made on the incubators, and certain parts were sent to the California Lutheran Hospital following that conference.

(6) Approximately 8.4 per cent of Armstrong's entire business is attributable to sales in California. At the time of the accident, out of which this action arises, Armstrong had sold a total of approximately 22,000 incubators in the United States. Plaintiffs calculate from figures supplied in the affidavits that in the 12 years before 1955, Armstrong had sold approximately $400,000 worth of incubators to California customers.

(7) Armstrong's direct mail advertising goes to several hundred customers, and prospective customers, in California, and its magazine advertising material reaches an equal number.

(8) Plaintiffs' several affidavits tend to show numerous other California contacts via the telephone and mails, and tend to show that Armstrong's representatives did in fact solicit sales at the several hospital association conventions, and on the occasions of the visits of Armstrong's officials to California above mentioned.

### APPLICABLE LAW

In view of the recent decision of the Supreme Court of the United States in *McGee* v. *International Life Ins. Co.*, 355 U.S. 220 [78 S.Ct. 199, 2 L.Ed.2d 223], and the more recent decision of the Supreme Court of California in *Henry R. Jahn & Son* v. *Superior Court*, 49 Cal.2d 855 [323 P.2d 437], it is entirely unnecessary for us to undertake here any comprehensive review of the earlier decisions. The latter decision cites all of the more recent California precedents including *Jeter* v. *Austin Trailer Equipment Co.*, 122 Cal.App.2d 376 [265 P.2d 130], wherein this court undertook a comprehensive digest and analysis of the apposite decisions, state and federal, which had been filed prior to December of 1953.

Our decision in *Jeter* v. *Austin Trailer Equipment Co.*, *supra*, reversed the trial court's order quashing service of summons upon a foreign corporation which sold its manufactured products in California solely through a manufacturers' agent. This agent represented several other manufacturers and was compensated "strictly on a commission basis." The decision holding the foreign corporation amenable to local services of process was rested very largely upon the activities of the manufacturers' agent in the solicitation of orders in California.

Following a comprehensive review of the authorities and after taking notice of "the changing philosophy regarding

the concept of 'doing business' which will subject a foreign corporation to local process," the Jeter decision epitomizes the then-current state of the law in the following language (122 Cal.App.2d at p. 388):

"By way of recapitulation of the current state of the law under the evolving concept of the 'doing business' requirement, it is deducible from the cases that the essentials of due process are fully met, at least for the purposes of amenability to local process and jurisdiction, if a foreign corporation maintains substantial contacts with a state through a course of regularly-established and systematic business activity, as distinguished from casual, isolated, or insubstantial contacts or transactions. The court must be astute to weigh the facts of the individual case to determine whether the particular type of activity in, relation to, or nexus with, the forum is of such substance as will make it just and equitable to conclude that a corporation is 'doing business' in the sense required by the purpose at hand."

The trend of California decisions rendered since 1953 has been consistent with the "continuing process of evolution" described by the United States Supreme Court in *McGee* v. *International Life Ins. Co., supra*, 355 U. S. 220 [78 S.Ct. 199, 2 L.Ed.2d 223, 226], in these words:

"Looking back over this long history of litigation a trend is clearly discernable toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."

With specific reference to the phrase "doing business in this State" as used in our Code of Civil Procedure, section 411, subdivision 2, the decision in the Jahn case declares (49 Cal.2d at p. 858): "That term is a descriptive one that the courts have equated with such minimum contacts with the state 'that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " (Citing *International Shoe Co.* v. *Washington*, 326 U.S. 310,

316 [66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057].) ■ The Jahn decision further defines the statutory phrase "doing business" as "synonymous with the power of the state to subject foreign corporations to local process." The last quoted language is credited to the cited case of *Eclipse Fuel etc. Co. v. Superior Court*, 148 Cal.App.2d 736, 738 [307 P.2d 739]. Also cited with approval is *Kneeland* v. *Ethicon Suture Laboratories*, 118 Cal.App.2d 211, which at page 222 [257 P.2d 727] declares that the concept " 'doing business' enlarges to the extent that the federal constitution permits it to enlarge."

■ Our California Supreme Court followed the decisions of the United States Supreme Court, cited at page 859 of the Jahn decision, in declaring: "Under the minimum contacts test of the International Shoe case regular sales solicitation alone can constitute doing business rendering the foreign corporation amenable to process in actions engendered by such activities."

■ Application of the above stated rules and principles to the facts of the instant case leads to the definite conclusion that the ruling of the trial court must be sustained. The evidence here presented unquestionably is sufficient to sustain the implied finding that petitioner was doing business in California within the meaning of the statute. Petitioner's contacts with California residents have been so numerous, so regular, and so continuous over a period of several years that in the aggregate they amount to many more than the necessary "minimum." We think it cannot fairly be argued that the maintenance of this action in California would offend "traditional notions of fair play and substantial justice."

The evidence before us shows that petitioner's solicitation of sales in California has been extensive, regular and continuous over a period of many years. These solicitations have been sufficiently productive of business that petitioner's California sales represent approximately one-twelfth of its total sales throughout the United States. The finding here under review is supported by evidence of other activities in California additional to its continuous solicitation of sales through direct mail advertising and through its program of advertising in periodicals circulated in California. Among others, these additional activities include repeated appearances in California by petitioner's executives and representatives for the purpose of exhibiting, demonstrating, selling and repairing its manufactured product.

It is immediately apparent from a reading of recent decisions, both state and federal, that the question as to which forum would be the more convenient is being given increasing consideration. In *McGee* v. *International Life Ins. Co., supra,* 355 U.S. 220 [78 S.Ct. 199, 2 L.Ed.2d 223] the Supreme Court alluded to the facilities of modern transportation and communication which ''have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.'' It seems pertinent in this case to observe that in a very real sense Los Angeles is now more easily and more comfortably accessible to the residents of Cleveland than it was to the residents of Pomona at the turn of the century.

In the Jahn case our California Supreme Court concluded its opinion with an observation that '' [a] denial of jurisdiction would lead only to a duplicity of litigation'' because the cause of action involved Jahn's dealings with a California plaintiff and with Jahn's codefendants, who were California residents. The same consideration weighs at least as heavily in the case at bar. Armstrong's codefendant, the St. John's Hospital, is a local corporation.

To the extent that the practical considerations implicit in the doctrine of *forum conveniens* are relevant to our decision, the balance of advantage would seem clearly to be in favor of allowing the merits of the instant case to be tried in California. It seems beyond reasonable dispute that the additional difficulties which plaintiffs would encounter and the additional costs which they would necessarily incur in prosecuting this action in Ohio would be far greater than any additional burdens which petitioner would incur as a result of being required to defend it here. Bearing upon this matter of convenience the following from the affidavit of plaintiff's counsel seems pertinent: ''That the accident which forms the basis of this complaint occurred in the City of Santa Monica, County of Los Angeles, State of California. That plaintiff was a nine-day-old infant at the time the accident occurred. That said infant is a resident of the County of Los Angeles, as well as his parents. That said infant has been permanently disabled for life as a result of the events described in the complaint. That the several doctors who have treated plaintiff and who will be necessary as witnesses to testify concerning injuries are residents of the County of Los Angeles. That the several nurses who attended plaintiff and can testify as to the events leading up to the explosion of ARMSTRONG'S

incubator reside in the County of Los Angeles. That the incubator which exploded and forms the basis of this litigation is located within the County of Los Angeles. That the investigators from the Fire Department who can testify as to the technical reasons for the explosion reside in the State of California. That affiant estimates between 15 and 20 witnesses can and will testify as to relevant facts in this case, and that all of them are residents of the State of California. That affiant knows of no witnesses in this case who are not residents of the State of California.''

It seems reasonable that these very real and practical considerations should be allowed to enter into our process of determining what action best comports with ''traditional notions of fair play and substantial justice.''

The alternative writ is discharged, and the petition for a peremptory writ is denied.

Fox, P. J., concurred.

ASHBURN, J., Concurring.—Upon the predicate that the ''minimum contacts'' doctrine supplies the definition of ''doing business'' under the law of California, I concur in the judgment. I do so with reluctance because of the belief that judicial pronouncements have, in disregard of the legislative prerogative, overridden the terms of the local statute.

''Statutory authority is a necessary basis for service upon a foreign corporation. (*Jameson* v. *Simonds Saw Co.*, 2 Cal. App. 582, 584 [84 P. 289]; *Perkins* v. *Benguet Consol. Min. Co.*, 342 U.S. 437, 440, 446 [72 S.Ct. 413, 96 L.Ed. 485].) And where the Legislature has provided for jurisdiction over a foreign corporation based upon something more than the minimum of due process (as that concept changes with the attrition of the years) it is not for the courts to set up some new and different standard.'' (*Confidential, Inc.* v. *Superior Court*, 157 Cal.App.2d 75, 80 [320 P.2d 546].)

The codes are to be construed as a single statute. (*Armenta* v. *Churchill*, 42 Cal.2d 448, 455 [267 P.2d 303]; *In re Porterfield*, 28 Cal.2d 91, 100 [168 P.2d 706, 167 A.L.R. 675].) This, of course, applies to the relationship between the Code of Civil Procedure and the Corporations Code. Section 411, Code of Civil Procedure, says: ''The summons must be served by delivering a copy thereof as follows: . . . 2. If the suit is against a foreign corporation . . . doing business in this State; in the manner provided by Sections 6500 to 6504,

inclusive, of the Corporations Code." The section presupposes a right to service upon a foreign corporation doing business here and incorporates by reference sections 6500 to 6504, inclusive, of the Corporations Code. The language of section 6504[1] plainly withholds the right to serve a foreign corporation which has departed from the state, except in actions arising out of intrastate business transacted here. That the right to serve foreign corporations while doing business in California is likewise limited appears from further consideration of the Corporations Code.

Sections 6500 to 6504 (incorporated by reference into Code Civ. Proc., § 411, subd. 2), are found in part 11 of that code. Section 6200 thereof says: "The definitions and general provisions set forth in this chapter govern the construction of this part." Section 6203: " 'Transact intrastate business' means entering into repeated and successive transactions of its business in this State, other than interstate or foreign commerce." Section 6300: "This part does not apply to corporations engaged solely in interstate or foreign commerce." Plainly, the right to serve foreign corporations is limited to those engaged in intrastate business (repeated and successive transactions in California), and does not include those engaged solely in interstate or foreign commerce.

In the "process of evolution," mentioned in recent decisions, the courts have expanded the concept of doing business to square with the repeatedly changing content of due process until California has committed itself to the proposition that any set of facts which would sustain service of summons as due process would also spell doing business within the state. *Henry R. Jahn & Son* v. *Superior Court,* 49 Cal.2d 855, 858 [323 P.2d 473], says: "The statute authorizes service of process on foreign corporations that are 'doing business in this State.' That term is a descriptive one that the courts have equated with such minimum contacts with the state 'that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' (*International Shoe Co.* v. *Washington,* 326 U.S. 310, 316 [66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057].) Whatever limitation

---

[1]Corp. Code, § 6504: "A foreign corporation which has transacted intrastate business in this State and has thereafter withdrawn from business in this State may be served with process in the manner provided in this chapter in any action brought in this State arising out of such business, whether or not it has ever complied with the requirements of Chapter 3 of this part."

it imposes is equivalent to that of the due process clause. ' "[D]oing business" within the meaning of section 411 of the Code of Civil Procedure is synonymous with the power of the state to subject foreign corporations to local process.' "

Feeling myself bound by the Jahn and similar decisions, I concur in the judgment at bar.

Petitioner's application for a hearing by the Supreme Court was denied July 2, 1958.

