PENNSALT CHEMICAL CORP. ET AL v.
CROWN CORK & SEAL CO., INC. ET AL

5-4341                                    426 S. W. 2d 417

Opinion delivered April 15, 1968

*Hale & Fogleman* and *Rose, Meek, House, Barron, Nash & Williamson* and *McMath, Leatherman, Woods & Youngdahl* and *Nance, Nance & Fleming,* for appellants.

*Frierson, Walker & Snellgrove* and *Wright, Lindsey & Jennings* and *McDonald, Kuhn, McDonald, Crenshaw & Smith* and *Rieves & Rieves,* for appellees.

Conley Byrd, Justice. Personal jurisdiction over nonresident appellees Crown Cork & Seal Company, Inc., a New York corporation with its principal place of business in Philadelphia, Pennsylvania; Superior Valve & Fittings Company, a Pennsylvania corporation; and

Chase Products Company, an Illinois corporation, under Ark. Stat. Ann. § 27-2502 C. 1(d) (Supp. 1967) (being § 103 [a] [4] of the Uniform Interstate and International Procedure Act), is the issue on this appeal by appellants W. C. Hull and Lillie Hull, his wife, and Pennsalt Chemical Corporation, a Pennsylvania corporation, which has filed a third party complaint against appellees. The statute provides:

"C. Personal jurisdiction based upon conduct.

1. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a (cause of action) (claim for relief) arising from the person's

(a) transacting any business in this State;

*    *    *

(d) causing tortious injury in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct in this State or derives substantial revenue from goods consumed or services used in this State;

*    *    *

2. When jurisdiction over a person is based solely upon this section, only a (cause of action) (claim for relief) arising from acts enumerated in this section may be asserted against him."

This case originated in the trial court as a tort action and a breach of warranty action, which were consolidated for trial purposes, against Pennsalt Chemical Corporation, a Pennsylvania corporation; Crown Cork and Seal Company, a New York corporation; Chase Products Company, an Illinois corporation; Superior Valve & Fittings Company, a Pennsylvania corpora-

tion; and in the warranty action against Budlock Refrigeration Supply Company, Inc., a Tennessee corporation.

The action arises out of an explosion on May 16, 1962, of a can of refrigerant manufactured by Pennsalt Chemical Corporation and labeled "PENNSALT HANDI-CAN REFRIGERANT 12." The can and top for the refrigerant were manufactured by defendant Crown Cork & Seal Company. The refrigerant was packaged in the can by Chase Products Corporation. The valve used by Hull in attempting to put the refrigerant into the air conditioner of an automobile was manufactured by Superior Valve & Fittings Company. The allegation in the complaint is that Hull's employer, the McCaa Chevrolet Company, purchased the Pennsalt Handi-can Refrigerant 12 from Budlock Refrigeration Supply Company, Inc.

The trial court restricted all interrogatories about appellees' solicitation of business and the revenues derived therefrom to matters arising before May 16, 1962, and upon the record made held that the court had no personal jurisdiction over appellees Crown Cork & Seal Company, hereinafter referred to as Crown Cork; Chase Products Company, hereinafter referred to as Chase; and Superior Valve & Fittings Company, hereinafter referred to as Superior Valve.

For reversal appellants contend that the trial court erred in holding that appellees' activities were not embraced within § 27-2502 C. 1(d), and in limiting or restricting interrogatories on the subject to the period before accrual of plaintiff's cause of action.

For affirmance appellees contend (1) that the cause of action involved herein did not arise from actions enumerated in § 27-2502 C. 1(d) as the same is restricted by subsection C. 2 of the statute; (2) that to submit them to the jurisdiction of the Crittenden Circuit Court would violate due process of law; (3) that appellees were not

regularly doing or conducting business or engaged in any other persistent course of conduct in Arkansas or deriving substantial revenue from goods consumed or services used in Arkansas; (4) that § 27-2502 C. 1(d) does not apply to a warranty case and (5) that appellants did not preserve their right on appeal to argue the limitation of interrogatories in the trial court.

It is admitted that appellees are not authorized to engage in business in the state of Arkansas, have no offices or places of business in the state and have no agents or servants resident in the state. It is further admitted that up to May 16, 1962, appellees had no warehouses and stored no merchandise in the state of Arkansas for delivery to customers.

The facts show that Chase does not sell directly to persons, firms or corporations in the state of Arkansas but does sell through independent brokers and manufacturers' agents. During the three years immediately before the accident it sold through such agents and shipped by common carrier to Little Rock Wholesale, Little Rock, Arkansas, an item known as "Super Spraysno." The amount shipped in 1960 was $1,987.78; in 1961 was $546.48; and in 1962 (up to May 16) was $123.60. Its annual sales volume is over $5,000,000. It had processed $22,000 worth of units for Pennsalt in connection with "Pennsalt Handi-can Refrigerant 12" for the period involved. This processing consisted of 63,955 units in 1960, no units in 1961, and 49,779 units in 1962 up to May 16. The units processed were, upon orders of Pennsalt, shipped by common carrier to all of the states bordering Arkansas.

Notwithstanding its shipments to the bordering states and the fact that it knew the intended use of the refrigerant, Chase denies that it had knowledge or reason to believe that the cans would be sold or used in Arkansas.

Superior Valve makes valves for high and low pressure gas industries; fire extinguishers and refrigeration; and allied assemblies such as manifolds, heat exchangers, liquid indicators and charging hoses for refrigeration and air conditioning. Valves and fittings for air conditioning and refrigeration use and valves for use with gases such as chlorine and oxygen are shipped to customers in Little Rock, Conway, Fort Smith and El Dorado, Arkansas. Annual sales made to such customers through manufacturers' agents amounted to $670 in 1959, $2,025 in 1960, $3,423 in 1961, and $2,743 in 1962. Superior Valve admits that it manufactured the FITZ-ALL valve described in the complaint, but states that from January 1, 1960 to October 15, 1965, it had shipped only twelve such valves to the state of Arkansas for a total revenue of $11.60.[1] The manufacturers' agents for Superior Valve left its advertising brochures with customers from time to time, and Superior Valve would mail them to a customer upon request. The only advertising of its products through news media was in national trade papers and magazines, none of which are published in Arkansas.

The interrogatories and affidavits of Crown Cork show that it manufactures containers and crowns. It admitted making cans of the type used by Pennsalt which it delivered to Chase in the state of Pennsylvania. In 1960, $332 worth of cans of this same type were sold to Southwest Aerosol of Little Rock, Arkansas, and $2,621 worth in 1961 to Reasor Hill Company, Jacksonville, Arkansas. It had one salesman who called on customers in Arkansas not more than eight times a year. Its Arkansas sales in 1960 totaled $719, in 1961 $3,191 and in 1962 $379. In an affidavit Crown Cork stated that its annual sales were $141,000,000 and that its Arkansas sales amounted to .24% of the total. Appellants interpret the total annual sales allocable to Arkansas as .24% of $141,000,000, or $338,400.

---

[1] It is not contended that the valve here involved is one of the twelve shipped to Arkansas.

The right of a state court to exercise personal jurisdiction over a nonresident for acts committed outside the state but affecting a resident of the state has been recognized in *McGee* v. *International Life Ins. Co.,* 355 U. S. 220, 2 L. Ed. 2d 223, 78 S. Ct. 199 (1957), where Justice Black in speaking for the court stated:

> "Since *Pennoyer* v. *Neff,* 95 U. S. 714, 24 L. Ed. 565, this Court has held that the Due Process Clause of the Fourteenth Amendment places some limit on the power of state courts to enter binding judgments against persons not served with process within their boundaries. But just where this line of limitation falls has been the subject of prolific controversy, particularly with respect to foreign corporations. In a continuing process of evolution this Court accepted and then abandoned "consent," "doing business," and "presence" as the standard for measuring the extent of state judicial power over such corporations. See Henderson, The Position of Foreign Corporations in American Constitutional Law, c.V. More recently in *International Shoe Co.* v. *State of Washington,* 326 U. S. 310, 66 S. Ct. 154, 90 L. Ed. 95, the Court decided that "due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." Id., 326 U. S. at page 316, 66 S. Ct. at page 158.

> "Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full con-

tinent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."

The only restriction in *International Shoe Co. v. State of Wash.*, 326 U. S. 310, 66 S. Ct. 154, 90 L. Ed. 95, 161 A. L. R. 1057 (1945), and *McGee* v. *International Life Ins. Co., supra*, is that before a state can exercise such jurisdiction it is essential that there be a showing that the defendant purposefully availed itself of the privilege of conducting activities within the forum state. It is recognized that such activities may be carried on by mail, *Travelers Health Ass'n.* v. *Commonwealth of Va.*, 339 U. S. 643, 70 S. Ct. 927, 94 L. Ed. 1154 (1950), and by an independent agent or manufacturer's representative, *Jackson* v. *National Linen Serv. Corp.*, 248 F. Supp. 962 (W. D. Va. 1965) ; *Gray* v. *American Radiator & Sanitary Corp.*, 22 Ill. 2d 432, 176 N. E. 2d 761 (1961) ; *Johnson* v. *Equitable Life Assur. Soc.*, 22 App. Div. 2d 138, 254 N.Y.S. 2d 258 (1964) ; and *Coreil* v. *Pearson*, 242 F. Supp. 802 (W. D. La. 1965).

We think the facts here show enough of a persistent course of conduct within the state of Arkansas by each of the nonresident corporations, either through its own agent or an independent manufacturer's agent, to constitute the minimum contacts necessary to give a state jurisdiction without offending the traditional notions of fair play and substantial justice. As pointed out in *Gordon Armstrong Co.* v. *Superior Court*, 325 P. 2d 21, 160 Cal. App. 2d 211 (1958), in determining this issue much consideration must be given to the forum which is more convenient and to the facilities of modern transportation and communication. Under today's mode of travel, the city of Little Rock is closer and more easily accessible to Dallas than it was to Pine Bluff, a mere

distance of 45 miles, a generation ago. Consequently, we hold that the exercise of personal jurisdiction does not violate the due process of law provisions of the United States Constitution.

Appellees' arguments (1) and (3), above, are based on the premise that subsection C. 2 makes it mandatory that the conduct that gave rise to the injury must have some relation to the activities upon which service is founded. Thus appellees argue that subsection C. 1(d), as modified by subsection C. 2, requires that the tortious injury must arise out of the business regularly solicited or engaged in by appellees. This argument is contrary to the comment of the commissioners in adopting the act, which specifically points out as follows:

"It should be noted that the regular solicitation of business or the persistent course of conduct required by section 1.03 (a) (4) need have no relationship to the act or failure to act that caused the injury. No distinctions are drawn between types of tort actions."

Furthermore, to adopt appellees' construction would limit the jurisdictional reach of subsection C. 1(d) to that of subsection C. 1(a) ("transacting any business in this State;"), thus making subsection C. 1(d) surplusage. We think the better construction is that an action brought under subsection C. 1(d) must be limited to a tortious injury in this state arising out of an action or omission outside of this state, thus preventing a citizen injured in Missouri from bringing a cause of action in Arkansas. But we do not interpret subsection C. 2 as applying to the qualifying portion of subsection C. 1(d) —i. e., ". . . if he regularly does or solicits business, or engages in any other persistent course of conduct in this State or derives substantial revenue from goods consumed or services used in this State; . . ." This interpretation places beyond jurisdictional reach of the statute those isolated transactions where the nonresident

has no other contact with the state, *Hill* v. *Morgan Power Apparatus Corp.*, 259 F. Supp. 609 (E. D. Ark. 1966), but on the other hand recognizes that one who pursues a persistent course of conduct or otherwise derives substantial revenue from activities in this state will be liable for acts committed outside this state resulting in injuries in this state. Therefore, we hold that the trial court erred in quashing service of summons upon the nonresident appellees.

Furthermore, we find that subsection C. 1(d) applies both to actions for breach of warranty and to actions in tort. Appellees' contention in this respect would unduly restrict the interpretation of the word "tortious." Most authorities treat personal injuries arising from an implied warranty as tortious in nature. See Prosser, Torts, Ch. 19 (3d ed. 1964); and Harper & James, The Law of Torts, Ch. XXVIII (1956). Also, in *Evans Laboratories* v. *Roberts, Judge*, 243 Ark. 987, 423 S. W. 2d 271 (1968), we recognized that a personal injury action for implied breach of warranty fell within our venue statute for personal injuries rather than being an action upon a contract.

It follows that the argument over whether appellants properly objected to the trial court's action has become moot. Since the issue may arise in the future, we point out that the testimony relative to the persistent course of the nonresident's conduct and to whether it derived substantial revenues subsequent to the date of the accident is ordinarily within the permissible scope of inquiry under subsection C. 1 (d).

Reversed and remanded.

FOGLEMAN, J., disqualified and not participating.