**ARKANSAS–BEST FREIGHT SYSTEM, INC., and Arkansas Best Corporation, Plaintiffs,**

**v.**

**John C. YOUNGBLOOD et al., Defendants.**

**No. FS–73–C–9.**

United States District Court, W. D. Arkansas,

Fort Smith Division.

April 20, 1973.

Harper, Young & Smith, Fort Smith, Ark., for plaintiffs.

Jones, Gilbreath & Jones, Fort Smith, Ark., for defendants.

## OPINION

JOHN E. MILLER, Senior District Judge.

This action was commenced January 17, 1973, seeking a declaratory judgment determining the rights and liabilities of the parties under the agreements and contracts described in the complaint and made exhibits thereto, and for such other relief to which the parties may be entitled.

The plaintiff Arkansas-Best Freight System, Inc. (ABF), is a corporation incorporated under the laws of the State of Arkansas, and the plaintiff Arkansas Best Corporation (ABC) is a corporation organized under the laws of the State of Delaware. Each plaintiff has its principal office and place of business in Fort Smith, Arkansas. All of the defendants are citizens and residents of the State of North Carolina with the exception of Graden J. Russell, who is a citizen and resident of the State of Texas. The matter in controversy exceeds the sum of $10,000, exclusive of interest and costs.

Jurisdiction of the court exists under 28 U.S.C. § 1332.

It is alleged in the complaint that on April 30, 1971, ABF entered into a written contract with Youngblood Truck Lines, Inc. (YTL), a North Carolina corporation, for the purchase by ABF from defendants of all the outstanding capital stock of YTL and merger with YTL, under the terms, conditions and provisions set forth in the contract and agreement, a copy of which is attached to the complaint as Exhibit 1. At the same time ABC entered into said agreement for the purpose of guaranteeing the performance of the contract by ABF.

The defendant John C. Youngblood was specifically designated in the contract as the agent of all other defendants, stockholders of all the capital stock of YTL.

On the same date the parties entered into an escrow agreement attached to the complaint as Exhibit 2. The contract and escrow agreement were executed on behalf of plaintiffs and by defendant John C. Youngblood, in his individual and custodial capacities, and by defendant Charles W. Moffitt in Washington, D. C., and in the State of North Carolina by all of the remaining defendants, except Graden J. Russell, who executed the same in the State of New Hampshire. The North Carolina National Bank, which is not a party, executed the escrow agreement in the State of North Carolina.

The contract for the sale of the stock was subject to and contingent upon approval thereof by the Interstate Commerce Commission, the North Carolina Utilities Commission, and any other regulatory agency of the United States or of any state whose approval might be a prerequisite to the consummation of the contract. The contract has been approved by such agencies.

On November 15, 1971, at Charlotte, North Carolina, plaintiffs and defendants undertook to consummate said transaction in accordance with the provisions of the contract by the payment by plaintiff ABF to John C. Youngblood for himself and as agent for the other defendants the total sum of $5,072,144.-69, and by payment to the North Carolina National Bank pursuant to the escrow agreement the sum of $300,000 as provided therein, making a total payment of $5,372,144.69, which of the parties agreed at that time was the consummation purchase price as defined in the contract, such to future adjustments to be made as provided in the contract and escrow agreement. The consummation was effected as of the close of business on November 14, 1971, the day before the actual payment of the money. On the day the money was paid, Articles of Merger merging YTL into ABF were filed with the Secretary of the State of North Carolina, whereupon YTL was merged into ABF as a survivor and YTL ceased to exist. The Articles of Merger were filed the next day in accordance with the laws of the State of Arkansas with the Secretary of the State of Arkansas, with the result that YTL was wholly merged into ABF, an Arkansas corporation, as a survivor. All of the assets of YTL were transferred to ABF by appropriate conveyances, in further consideration of which ABF agreed to assume and did assume all liabilities of YTL and its wholly owned subsidiary, Youngblood Service Company (YSC), as provided in the contract, thus making YSC a wholly owned subsidiary of ABF. Upon the completion of the merger all books of account and pertinent financial records of the disappearing corporations were physically transferred to ABF's principal office in Fort Smith, Arkansas.

The contract further provides that the former North Carolina corporation, YTL, as of the date of the consummation of the contract and the merger date, would cause to be prepared complete financial statements and that the same thereafter would be audited by Arthur Andersen & Co., Independent Public Accountants, which would issue a certified report to all of the parties involved. Thereafter, Arthur Anderson & Co. submitted a report to the plaintiffs at their principal offices in Fort Smith, Ark., and in accordance with the terms of the contract, Douglas Walker & Co., accountants, representing the plaintiffs, examined the submitted report and disagreed therewith. In their statement to the plaintiffs, Douglas Walker & Co. stated that the purchase price as defined in the contract should have been determined to be $5,266,569.00 as of the consummation date of the purchase, subject to further adjustments as provided in the contract. The further adjustments were made by Douglas Walker & Co. and defendants were advised of the findings, and the defendants, upon receiving the report of Douglas Walker & Co., notified plaintiffs that they did not agree to the adjustments and conclusions in the report of Douglas Walker & Co.

On October 27, 1972, at Fort Smith, Ark., the plaintiff ABF and defendants attempted to settle their disagreement but were unable to agree, but they did enter into a written Memorandum Agreement whereby they agreed to amend the Contract of Sale by striking therefrom Articles 1.4 and 1.6 which provided for arbitration of disputed items between the parties by a mutually acceptable third-party accountant. Copy of the Memorandum Agreement deleting those provisions of the contract is attached to the complaint as Exhibit 3. As a result, if the parties are unable to reach an agreement, they are left to their respective legal remedies.

On December 21, 1972, the parties again undertook to reach an agreement on the adjusted consummation but were unable to do so.

The plaintiff and defendants have agreed that they are unable to reach an agreement as to the adjusted purchase price as of the date of consummation of the contract, and defendants have requested plaintiffs to authorize a release

of a portion of the aforementioned escrow deposit which the plaintiffs have refused to do.

The plaintiffs are asking the court to declare the rights and liabilities of the parties under the contract in order that the transaction may proceed to a complete and final consummation in accordance with the terms of the contract.

On February 9, 1973, the defendants filed their motion to dismiss, in which they alleged lack of jurisdiction over the person of the defendants, insufficiency of process and insufficiency of service of process. They also alleged that none of the defendants have done any acts in the State of Arkansas that would subject them to service of process by a United States District Court sitting in the State of Arkansas.

The motion was heard by the court on April 12, 1973, at which time the court had before it the entire record, including the documents referred to in the complaint; the affidavits of J. B. Speed and Donald L. Neal, together with the ore tenus testimony of defendant John C. Youngblood, Charles Ephriam, attorney for all the defendants, and Kenneth Barlow.

Prior to the hearing on April 12, the defendants had submitted a memorandum in support of their motion, and plaintiffs had submitted a memorandum in opposition thereto. At the conclusion of the hearing, the defendants submitted requested findings of fact, a chronology of events and a memorandum in answer to the memorandum of plaintiffs above referred to.

In 1963 the General Assembly of Arkansas enacted the Uniform Interstate and International Procedure Act, Ark. Stat.Ann. § 27–2501 et seq. (1962 Repl.). In subsection A of § 27–2502 "person" is defined as including an individual or his executor, administrator or other personal representative, whether or not a citizen or domiciliary of Arkansas, and if a corporation, whether or not organized under the laws of Arkansas.

"C. Personal jurisdiction based upon conduct.

"1. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a (cause of action) (claim for relief) arising from the person's

(a) transacting any business in this State;

\* \* \* \* \* \*

"2. When jurisdiction over a person is based solely upon this section, only a (cause of action) (claim for relief) arising from acts enumerated in this section may be asserted against him.

"D. Service outside the State. When the exercise of personal jurisdiction is authorized by this section, service may be made outside this State."

Section 27–2503 provides:

"A. Manner and proof of service.

"1. When the law of this State authorizes service outside this State, the service, when reasonably calculated to give actual notice, may be made:

(a) by personal delivery in the manner prescribed for service within this State;"

The court has jurisdiction of the subject matter, and the sufficiency of service of process is determined by the provisions of Rule 4, Fed.R.Civ.P., and § 27–2503, Ark.Stat.Ann., (1962 Repl.).

Under Rule 4(d)(7), Fed.R.Civ.P., service may be made as follows:

"Upon a defendant of any class referred to in paragraph (1) or (3) of this subdivision of this rule, it is also sufficient if the summons and complaint are served in the manner prescribed by any statute of the United States or in the manner prescribed by the law of the state in which the district court is held for the service of summons or other like process upon any such defendant in an action brought in the courts of general jurisdiction of that state."

Sec. 27–2503, Ark.Stat.Ann., (1971 Supp.), provides:

"2. Proof of service outside this State may be made by affidavit of the individual who made the service or in the manner prescribed by the law of this State, the order pursuant to which the service is made, or the law of the place in which the service is made for proof of service in an action in any of its courts of general jurisdiction. When service is made by mail, proof of service shall include a receipt signed by the addressee or other evidence of personal delivery to the addressee satisfactory to the court."

The returns of the United States Marshal on the process issued, as well as the affidavit of John C. Youngblood, disclose that he and the other defendants were served individually by delivering a copy of the summons and complaint to them.

There is very little, if any, dispute between the parties as to the material facts concerning the dates and places of the various negotiations which led to the execution of the contract of sale now before the court.

Prior to the sale YTL held Certificates of Convenience and Necessity for the transportation of freight in a large area in the eastern part of the United States. Also, ABF held many such Certificates, and in the operations under the various Certificates YTL and ABF had terminals in many of the same states and points of delivery. A few such were Chicago, Ill., Indianapolis, Ind., and Cincinnati, Dayton, Columbus and Akron, Ohio.

Sometime in the 60's, probably in 1966 or 1967, Mr. Bob Powell, an official of ABF, called on Mr. Youngblood in his principal offices in North Carolina and stated to him that if he should care to sell YTL, that ABF would probably be interested in purchasing the entire business.

During all the times material herein, Mr. J. B. Speed was President and Chief Executive of ABF and also Vice President of ABC which owns ABF. In his official capacity, Mr. Speed attended a great many conventions and committee meetings held at various places and times by corporations, organizations and individuals engaged in similar businesses, at which Mr. Youngblood was present. During these meetings, Mr. Speed and Mr. Youngblood discussed their various problems and were of some assistance to each other in the solution of the problems common to the operation of businesses under Certificates of Convenience and Necessity.

In the summer of 1970 Mr. Youngblood and his family were in Fort Smith, Ark., for some two or three days and visited with Mr. Speed and his family. At that time Mr. R. A. Young, Jr., Chairman of the Board of ABC, was in Colorado, and Mr. Youngblood and his family spent the time in Fort Smith on that occasion in the Fort Smith home of Mr. Young. Later in the same summer, Mr. Youngblood was in Colorado Springs, Colo., where Mr. Young had a home. By mutual agreement Mr. Speed met with Mr. Youngblood and Mr. Young in Colorado Springs where they discussed the terms of a contract for the purchase of YTL and its subsidiary. The discussions were not reduced to writing, but a sale was contemplated at that time on the basis of an installment contract with a substantial down payment, but never was completed because of the inability of ABC and ABF to obtain the necessary capital without subordinating the payments of the installments on the sale price to the First National City Bank of New York.

The next meeting between the parties was in Charlotte, N. C., on September 10, 1970, and revolved around the proposal of purchase and the payment of the price in installments. In December 1970, YTL advised ABF that they would not consummate the deal because of the requirement of the bank to subordinate the deferred payments to the bank. Later, ABF was able to obtain sufficient money to pay cash, and Mr. Youngblood was so advised.

Discussions continued from time to time between Mr. Speed and Mr. Youngblood. They had many discussions over long distance telephone and at the various conventions, etc.

In the meantime, a strike occurred in the City of Chicago of such proportions as to cause Mr. Youngblood to desire to sell YTL and its subsidiary, and he so advised Mr. Speed. ABF then renewed its proposal to purchase along the same lines as the original proposal except that the sale would be a cash transaction. The parties then began drafting the contract of sale, and on April 30, 1971, they met in Washington, D. C., and the contract in its present form was drafted. It was signed by Mr. Youngblood for himself and as the representatives of all the sellers and by ABF and ABC at Washington, D. C. On the next day, May 1, 1971, the contract was signed by Mr. Graden J. Russell at Manchester, N. H., and by all the other sellers at Fletcher, N. C. The ICC approved the contract on October 15, 1971. The Articles of Merger merging YTL into ABF were filed with the North Carolina Secretary of State and with the Arkansas Secretary of State on November 16, 1971. Thus, the contract was consummated on November 15, 1971, effective as of November 14, 1971, subject to certain adjustments mentioned in the contract.

ABF and ABC took over all of the assets of YTL as an integral part of ABF's system as of 12:01 a.m., November 15, 1971. About three weeks thereafter all of the books and records of accounting were moved to ABF's offices in Fort Smith, Ark.

Mr. Youngblood came to Fort Smith in late February or early March 1972 to discuss various items relating to adjustments in the purchase price as provided in the contract, and on several occasions after November 15, 1971, representatives of Arthur Andersen & Co., accountants representing the sellers, were in Fort Smith to examine the former books and records of YTL in connection with the preparation of their report re-

quired by the contract. Various phases of the adjustments were discussed during that time with the accountants of ABF, Douglas Walker & Co.

On October 26–27, 1972, Mr. Youngblood and his attorney, Mr. Ephriam, came to Fort Smith for a discussion with Speed and other officers of ABF regarding the items in dispute, and at that time a memorandum amending the original contract to delete the provisions therein for referral of disputes to a third-party accountant were eliminated. Later, on December 21, 1972, Mr. Youngblood and Mr. Ephriam returned again to Fort Smith for further discussions between them and ABF relative to the matters in dispute, but were unable to reach an agreement.

The court has heretofore set forth the material allegations in the complaint, many of which are not controverted in any manner. The defendants filed with the court requested findings of fact, together with a "Chronology of Events" which the court has likewise examined, and finds after a thorough consideration of all the evidence before the court that the above and foregoing constitute the material facts relative to the execution of the contract and service of process.

The problems before the court are two-fold. First, are the defendants' activities within Arkansas embraced within the wording of the statute? Second, assuming the defendants' activities to be within the statutory language, is it a denial of due process to assert jurisdiction on the basis of such activity? See, "The Far Side of Jurisdiction," by Henry Woods, 22 Ark.Law Review, No. 4, p. 627 et seq.

 Personal jurisdiction over a nonresident defendant does not depend upon the physical presence of the defendant within the state. The jurisdiction of the court may be challenged prior to the trial on the merits. There is no statutory direction for a procedure upon an issue of jurisdiction. The mode of its determination is left to the trial court. The court may receive and weigh

affidavits in addition to the ore tenus testimony. O'Hare International Bank v. Hampton (7 Cir. 1971), 437 F.2d 1173.

The defendants insist that their activities within the State of Arkansas during the discussions and negotiations resulting in the execution of the contract upon which the suit is based were insufficient to establish jurisdiction of the court to render the judgment sought by plaintiffs. In considering that contention, the court must consider the nature and quality and circumstances of what was done within the State of Arkansas prior to and which resulted in the execution of the contract.

In International Shoe Co. v. State of Washington (1945), 326 U.S. 310, 66 S. Ct. 154, 90 L.Ed. 95, the court, in discussing the question of jurisdiction, referred to the fact that historically the presence of a defendant within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him, and held:

"But now that the capias ad respondendum has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

In McGee v. International Life Ins. Co. (1957), 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223, the court, speaking through Mr. Justice Black, considered the due process clause of the 14th Amendment to the Constitution, and held that such clause places some limit on the power of state courts to enter binding judgments against persons not served with process within their boundaries, but stated:

"But just where this line of limitation falls has been the subject of prolific controversy, particularly with respect to foreign corporations. In a continu-ing process of evolution this Court accepted and then abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over such corporations."

The court considered and discussed Penoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, and International Shoe Co., supra, and held:

"Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.

"Turning to this case we think it apparent that the Due Process Clause did not preclude the California court from entering a judgment binding on respondent. It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State."

In O'Hare International Bank v. Hampton (7 Cir. 1971), 437 F.2d 1173, the court at page 1175 said:

"In situations where federal jurisdiction is based upon diversity of citizenship, in personam jurisdiction 'is determined in accordance with the law of the state where the court sits, with "federal law" entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee.' "

\* \* \* \* \* \*

"Personal jurisdiction over a non-resident defendant does not depend upon the physical presence of the defendant within the state. It is sufficient that the act of transaction itself has a substantial connection with the forum state." (Citations omitted.)

The court cited and discussed McGee v. International Life Ins. Co., supra, and at page 1176 said:

"Whether sufficient minimum contacts exist cannot be answered by applying a formula or rule of thumb, but by ascertaining what is fair and reasonable in the circumstances of the particular situation."

The long arm statute of Arkansas is very similar to the long arm statute of Illinois. A study of the decisions of the Illinois courts along with those of Arkansas definitely establishes that the legislative intent of the Arkansas long arm statute is to exert jurisdiction over nonresidents to the extent permitted under the due process clause.

In Thompson v. Ecological Science Corp. (8 Cir. 1970), 421 F.2d 467, the court at page 468 said:

"The Arkansas Supreme Court has given this statute a broad and liberal construction. See Pennsalt Chemical Corp. v. Crown Cork & Seal Co., Inc., 244 Ark. 638, 426 S.W.2d 417 (1968); Safeway Stores, Inc., v. Shwayder Bros., Inc., 238 Ark. 768, 384 S.W.2d 473 (1964). See also the excellent analysis of the overall problem involving use of the long arm statutes in Arkansas by Henry Woods in The Uniform Long-Arm Act in Arkansas: The Far Side of Jurisdiction, 22 Ark. L.Rev. 627 (1969)."

In Wichman v. Hughes, 248 Ark. 121, 450 S.W.2d 294 (1970), the court held that a single transaction resulting in injury or loss is sufficient under the statute to confer personal jurisdiction over a nonresident in a cause of action arising from the person's "transacting any business in this State."

In Thompson, supra, the court reviewed many of the Arkansas and federal court decisions subsequent to International Shoe, and held that a group of Arkansas and Tennessee citizens could maintain an action against a foreign corporation whose sole contact with the State was its presence in Arkansas for two days of negotiations leading up to the execution of a contract which was later reduced to writing and signed outside the State of Arkansas. The trial court had dismissed the suit on the ground that the defendant had not established within the State of Arkansas minimum contacts so as to come within the established tests of due process. In considering the appeal, the court at page 470 of 421 F.2d held:

"The defendant's activities in Arkansas were directed toward the consummation of the contract in question. An ordinarily insignificant contact with a state becomes constitutionally significant when it gives rise to the claim involved in the lawsuit. See McGee v. International Life Insurance Co., supra; Gkiafis v. Steamship Yiosonas, 342 F.2d 546, 556 (4 Cir. 1965); cf. Dragor Shipping Corp. v. Union Tank Car Co., 361 F.2d 43 (9 Cir. 1966). Additionally, the State of Arkansas has an interest in any contract involving its citizens, but it has a special interest in protecting the rights of its citizens under a contract negotiated and effectuated in Arkansas. As recognized in Southern Machine Co. v. Mohasco Industries, Inc., 401 F.2d 374, 385 (6 Cir. 1968), 'when the contract is with a resident \* \* \* the State's interest in resolving a suit based on the contract and brought by that resident cannot be doubted.' See also Developments —Jurisdiction, 73 Harv.L.Rev. 909, 928 (1960).

"As discussed above, the fact that the claim for relief relates directly to the activities which were transacted in Arkansas is relevant as an indicia of the qualitative contact made.

\* \* \* \* \* \*

"Under the totality of circumstances, we hold that the requirements of due process have been satisfied even though the jurisdiction is based upon minimal activities by the defendant in the forum state. See Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951 (2 Cir. 1967); National Gas Appliance Corp. v. AB Electrolux, 270 F.2d 472 (7 Cir. 1959); Bluff Creek Oil Co. v. Green, 257 F.2d 83 (5 Cir. 1958); 18 Fletcher, Cycl. Corporations § 8722 at 319 (1969)."

In Electro-Craft Corp. v. Maxwell Electronics Corp. (8 Cir. 1969), 417 F. 2d 365, the court held that the answer to the due process question depends upon whether the defendant's contacts with Minnesota were such that "the maintenance of the suit [in Minnesota] does not offend 'traditional notions of fair play and substantial justice.'" The court reviewed at length the opinion of the court by Mr. Justice Blackmun in Aftanase v. Economy Baler Company, 343 F.2d 187 (1965), while he was a Circuit Judge in the Eighth Circuit, and outlined the five factors to be considered in determining whether the fair play and substantial justice requirements were satisfied: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience to the parties. A consideration of these factors convinces us that the exercise of jurisdiction was consistent with constitutional requirements."

Haldeman-Homme Mfg. Co. v. Texacon Industries, Inc. (D.Minn.1964), 236 F.Supp. 99, was an action by a Minnesota corporation against a Texas corporation for false representations and breach of contract. The defendant had placed an advertisement in the Wall Street Journal offering to sell the folding-door division of its business. The plaintiff replied to the advertisement, and the parties entered into negotiations resulting in the purchase by Haldeman of the defendant's division operation. None of Texacon's duties under the contract was to be performed in Minnesota nor did any of Texacon's officials ever go to Minnesota during the negotiations. Immediately after the execution of the contract, all of the assets, inventory, materials and machinery associated with the folding-door division were moved by plaintiff to its place of business in Minneapolis. The court, in determining whether the operation of the Minnesota long arm statute constituted a denial of due process to Texacon, said at page 102:

"Texacon has sold a going business with the knowledge that it would be moved to Minnesota with all the attendant effects on that State's economy and citizens. In addition, the contract, notes and mortgage would normally have to be enforced in Minnesota. Thus Texacon has contemplated and caused substantial effects within Minnesota which appear to satisfy the due process requirement of 'minimal contacts.'"

The relevant facts in National Gas Appliance Corp. v. AB Electrolux (7 Cir. 1959), 270 F.2d 472, cert. den., 361 U.S. 959, 80 S.Ct. 584, 4 L.Ed.2d 542, all appeared in the complaint as amended and the accompanying affidavits filed in support of defendant's motion to dismiss affidavits of plaintiff in opposition thereto. The making of the contract in this case followed mail, telephone and telegraph negotiations between the parties beginning in August 1957. The terms of the contract appeared in a letter dated January 21, 1958, mailed by defendant from Stockholm, Sweden, to plaintiff's president in Chicago, Ill., as accepted on January 29, 1958, by plaintiff's telegram to defendant. During these negotiations, an agent of the defendant went to plaintiff's place of business in Chicago in connection with the problem of fabricating a cabinet to house the Electrolux unit. He spent about four days, as well as several evenings, in Chicago. On February 10, 1958, the defend-

ant cabled the plaintiff: "* * * further damaging information your financial background and dealings forces us withdraw offer forthwith we consequently unable deal with you." The plaintiff, upon receipt of the cablegram, filed the suit for breach of contract. The defendant contends that the District Court erred in denying its motion to dismiss for want of jurisdiction of defendant. The court, in reversing the trial court, stated:

"We are not at this time concerned with the merits of this case. We merely hold that the district court, under Illinois law, has jurisdiction of the cause of action asserted against the defendant AB Electrolux in this case."

The court found that the efforts of the representative of defendant "were obviously directed toward the consummation of the contract in question."

The decision has been cited with approval by several courts, including the Eighth Circuit in Thompson v. Ecological Science Corp., supra; Consolidated Laboratories, Inc., v. Shandon Scientific Co. (7 Cir. 1967), 384 F.2d 797; Scovill Mfg. Co. v. Dateline Electric Co., Ltd. (7 Cir. 1972), 461 F.2d 897; Karlin v. Avis (E.D.N.Y.1971), 326 F.Supp. 1325.

In In-Flight Devices Corp. v. Van Dusen Air, Inc. (6 Cir. 1972), 466 F.2d 220, the court at page 235 in Footnote 26 said:

"We do not rely on any negotiations which may have taken place in Ohio as support for our decision. It should be noted, however, that substantial contract negotiations taking place within the forum state have been held to be a sufficient basis upon which to predicate jurisdiction. [Citing many decisions.] We believe that the negotiations assertedly undertaken in Ohio in this case could provide the basis for jurisdiction if properly established at a fact finding hearing or at trial. Our disposition of this case makes it unnecessary to rely on these negotiations, however."

The material factors sub judice are the quality and nature of the activity of the defendant John C. Youngblood as a representative of himself and other stockholders. There is no doubt but that the contract as finally signed was merely a recap of the negotiations in Arkansas and Colorado. The first negotiations held in Arkansas were not consummated and reduced to a written contract for the reason that ABF was unable to obtain the money with which to pay the purchase price, but later when ABF was able to borrow the money, the negotiations were resumed and the final contract, the one that is involved, resulted and while signed in places other than Arkansas, it was nothing more than a restatement of the original negotiations and agreement of the parties with the added change in the time and manner of the payment of the purchase price.

■ ■ The court is convinced that the activities within Arkansas of the defendants are embraced within the wording of the statute, and the demands of due process were met by the contacts and negotiations of the parties in the State of Arkansas so as to make it reasonable in the context of our federal system of government to require the defendants to defend the instant suit. The service of process is valid.

The controversy between the parties is exceedingly minor when compared with the purchase price already paid by ABF. The controversy lies in the failure of the respective accountants to agree, and that can only be resolved by a thorough examination of the books and records of YTL, which are in the principal office of ABF in Fort Smith, Ark. It is difficult to understand why the defendants would insist on the trial of this controversy at a place where it would be necessary and expensive for the parties to transfer all of those records from Fort Smith, Ark., to North Carolina.

The motion of defendants to dismiss should be denied, and an order is being entered today denying the motion.