RAY SCOTT v. THE CITIZENS BANK, BATESVILLE, ARK.

4634                                          431 S.W. 2d 832

Opinion Delivered September 30, 1968

*Lightle & Tedder* for appellant.

*Bennett & Purtle* for appellee.

CARLETON HARRIS, Chief Justice. This case involves a certificate of deposit. Ray Scott of Bald Knob, Arkansas, and Ernie Gaskin were stockholders in the Americana Motel at Bald Knob. A few months after the commencement of the operation of the motel, Scott decided to sell his stock to Archie Mason for $19,-000.00. Gaskin and Mason borrowed the money from Citizens Bank of Batesville, and executed their note on June 15, 1964, for that amount, the due date being December 15, 1964. Scott guaranteed the payment of the note by executing a "Limited Guaranty Agreement," and by assigning to the bank a certificate of deposit in the amount of $15,000.00. As the due date of the note approached, it became apparent that the note would not be paid. Gaskin, by telephone, contacted Scott, who was then living in Valdosta, Georgia. On December 19, the bank wrote Scott, and, according to appellant's contention, sent a new limited guaranty agreement for execution, the purpose being to guarantee a six months' extension of the June 15, 1964, note. Appellee contends that the new guaranty agreement was for the pur-

pose of guaranteeing a new note to be executed by Gaskin and T. B. Jackson in lieu of the Gaskin-Mason note. This instrument was not dated when received by Scott, and the space for the indentity of the co-signer of the note was also blank. The agreement did however refer to the note dated June 15, 1964. Scott dated all copies, signed, kept one copy and returned the other two to appellee. Thereafter, apparently about January 28, 1965, the bank relinquished the Gaskin-Mason note to Mason, and accepted a new note from Gaskin and T. B. Jackson. Scott contends that he knew nothing about this substitution of Jackson for Mason until the summer of 1965.

The Gaskin-Jackson note became due on June 16, 1965, was not paid, and on July 26, 1965, the bank accepted a payment of $2,000.00 and interest; no court proceedings were instituted, and another payment with interest was accepted on March 19, 1966. Scott contends that in the first instance, the note due in June, 1965, was extended to January, 1966, and that the note was subsequently extended to June 15, 1966. It is his contention that both extensions were without notice or without his consent. On July 1, 1966, the bank applied Scott's certificate of deposit to the Gaskin-Jackson note. Appellant had made a demand for the certificate, and upon being refused, instituted suit against the bank in the Circuit Court of Independence County. The bank in its answer sought reformation of the second guaranty agreement, contending that a scrivener's error had occurred in preparing this instrument with reference to the June 15, 1964, date; that the agreement actually referred to the subsequent note executed by Gaskin and Jackson on January 28, 1965. The case was tried by the Independence Chancery Court, to which it had been transferred by the Circuit Court, and from an adverse decree, appellant brings this appeal. For reversal, it is first asserted that the court erred in granting reformation of the second limited guaranty agreement dated December 15, 1964, so as to apply to

the note of Gaskin and Jackson of January, 1965. This is the most important point in the litigation, and the controlling one.

Appellant's argument is that he was sent the second guaranty agreement while residing at Valdosta, Georgia, and that he thought he was agreeing to extend the Gaskin-Mason note until June, 1965. This agrument is supported by the heretofore mentioned fact that the instrument referred to the note (which had been signed by Gaskin and Mason) of June 15, 1964. This is typed into the instrument, and Scott left all the blanks intact, except that he filled in the date of the agreement between himself and the bank as December 15, 1964. Scott asserts that he did not know about a new note signed by Gaskin and Jackson until the summer of 1965, and after his return to Arkansas. In fact, he testified that he had never heard of T. B. Jackson until after returning to this state.

Manual Conyers, Executive Vice-President of Citizens Bank, testified that he was the bank official who handled this particular transaction, and he stated that the reference to the note of June 15, 1964, was a scrivener's error; that the date should have been January 28, 1965, the date of the new note. The witness said that he did not know how the error occurred, though it appeared most likely that the mistake was made by an employee of the bank. This alleged error was the basis for the bank's prayer for reformation of the instrument. Mr. Conyers also testified that Scott knew that Mason would no longer be "on the note," and that instead, Jackson would execute the new note; however, he was unable to state how he knew this fact to be true, or pinpoint just when Scott received that information from him. The witness said that he had some telephone conversations with Scott, but he finally stated that he did not know when Scott received the information. The testimony of the witness is not at all positive; indeed, to the contrary, the portion relating to whether Scott

knew of the change in note signers is rather notable for uncertainty, and if this were the sum total of the testimony, a different result might well be in order.

However, testimony developed during the examination of Scott is entirely in conflict with appellant's assertions. On cross-examination, counsel for appellee asked if appellant recalled the taking of his (appellant's) discovery deposition, at which time certain questions and answers were given. The witness replied that he did remember. Thereafter, the record reflects the following:

"Q. And you stated at that time, and correct me if I am wrong, that this originally was a matter of Mason and Gaskin; and, now, Mason had got out, and you said, 'and Jackson has come in.' That is right?

A. Yes, sir; at that time, I didn't know exactly what the date was at this time.

Q. Now I asked you this question: This certificate of deposit for $15,000.00 was placed as security for the payment by Jackson and Gaskin? And you answered: Yes, sir, just guaranteeing the loan that they secured from the Bank.

A. That was a mistake; it should have been 'Mason;' Jackson wasn't even in it; I didn't know anything about that until later in .'65.

\* \* \*

Q. At the time of the discovery deposition, I asked you particularly what your objection was to paying this, and I believe you said that they extended time to Gaskin and Jackson.

A. Well, that was a mistake; it should have been Mason.

Q. I handed you that particular note of Gaskin and Jackson and asked if that is the note which you guaranteed with the deposit. And you answered: Of course this note here was guaranteed when I was in Georgia, I imagine, with Jackson on here; it was probably sent to Gaskin; I don't know. See, this particular one, I was probably in Georgia when Jackson signed it; so I wasn't in Arkansas at this time; but the $19,000.00 was the note that I had the CD on. Was that your answer then?

A. This was still a mistake on the names.''

Subsequently, during the trial of the case, Scott was called as an adverse witness. Counsel recalled to the witness that he had asked Scott (during the taking of the deposition) how appellant became involved in the matter. He was then asked about the following answers given at that time.

''Well, when I sold my part out to Mason.

Question. Sold your part of what?

Answer. The motel in Bald Knob; and I guaranteed with a certificate of deposit of $15,000.00 to cover the part they borrowed.

Then Mr. Bennett asked you:

Question. The part they borrowed; and who are 'they?'

Answer. Mason and Gaskin.

Question. Well, now Mason has gone out of this, and I believe this is - - - -

Then you interrupted:

And Jackson has come in, that's right.
Do you remember answering that?

A. Well, I am sure I did if it is on there.

Q. I am asking you again if these are correct statements; remember, please. you were under oath at the time:

Question. This certificate of deposit for $15,000.00 was placed as a security for the payment by Jackson and Gaskin?

Answer. Yes, sir, just guaranteeing the loan that they secured from the Bank.

And Mr. Bennett had just before handed you this limited guaranty agreement when you answered that question.

Question. All right. Now what did you understand that guarantee to imply or to mean?

Did you answer:

Well, to be paid within 6 months with my signature guaranteeing an extension.

Question. Now extension of what?

Answer. Well, the extension of the loan, if we wanted to.

Question. Now did you understand that if Jackson and Gaskin did not pay the Bank according to their note that your certificate of deposit would be applied to pay the note?

Objection by Mr. Tedder: The agreement speaks for itself.

Question by Mr. Bennett: Well, now he has his objection of note. If you can answer it, answer it.

Answer. No answer.

Question. Let me phrase it this way.
No other question.

Answer. Well, on the agreement, of course, Gaskin and Jackson at 6 months has to pay the $19,-000.00; if it is renewed for 6 months, I have to give my signature of the extension myself.

Question. Did you make those statements?

A. Yes, sir, if that's on - - - -

Q. Were those true statements?

A. I don't think so."

Counsel subsequently asked Scott about his understanding of what would happen if no extensions were made. Appellant had answered: "That the bank would file against Gaskin and Jackson to collect." At the instant trial, Scott said: "It still should have been Mason."

It will be observed that the name "Jackson" does not come into the record just once or twice, in which event it would be possible that Scott could have overlooked the name "Jackson" being used instead of "Mason;" actually, Scott mentioned the name "Jackson" himself.

A letter appears in the record from Scott's attorney in January, 1966, the status of the Gaskin-Jackson note being the subject matter of the letter. Appellant also admitted this circumstance. From the record:

"Q. And during that time that Mr. Murphy was representing you, did he not write you from time to time about Mr. Jackson?

A. Yes, sir."

We think this testimony by Scott is clear, convincing and decisive evidence that he was fully aware of the fact that Jackson had been substituted in the new note for Mason. Relative to this evidence, appellant simply reiterated, "That was a mistake."

Scott testified that he did not learn about the substitution of names until he returned to Arkansas in the summer of 1965. This being true, it is difficult to understand why appellee did not institute a suit at that time, instead of waiting a year. Logic dictates that one normally would take action immediately, or within a short time after learning that he had been misled, and was being held responsible for the debt of a person he did not even know.

At any rate, we are of the opinion that the testimony quoted from the record also answers appellant's argument relative to reformation. Since we have concluded that the Chancellor was justified in holding that the second guaranty agreement was executed by Scott with full knowledge that a new note was to be made and signed by Jackson, it follows that appellant would likewise have known that the date of the note mentioned in this guaranty agreement was a mistake. In other words, the first holding controls the second. The fact that the second note had not been executed at the time of the signing of the guaranty agreement is of no effect if Scott was aware of the purpose of the guaranty agreement (which the trial court found was signed by appellant as a matter of guaranteeing the Jackson note).

It is argued that the court erred in its decree, because the guarantor did not agree to the last extensions of the note. In the first place, we are inclined to agree with the bank's contention that no extension was granted; rather, it appears that the bank was simply holding a past due note. Scott testified that all extensions granted were in writing. The record reveals only one writing relating to this argument. A letter was di-

rected to Scott from Conyers on March 22, 1966, as follows:

"Dear Ray:

Enclosed you will find our check for $600.00 which is for interest earned by your $15,000.00 CD up to June 15th last year. We are glad to be in a position to release this to you.

Ray, regarding the balance, their note is still past due since January as far as our records are concerned. However, I did promise them we would take no legal action to collect before June 15th and with the $2,510.00 paid I think that was a good bargain for all of us.

Feel free to call or come over any time you think we can be of help."

This letter does not appear to be an actual extension. 10 C.J.S. *Bills and Notes* §263 (1938) defines the term "extension" as follows:

" 'Extension' of time of payment means a valid and binding agreement to delay the enforcement of the instrument."

See also *Stone and McDonald* v. *State Bank*, 8 Ark. 141, wherein we recognized a distinction between granting an extension, and simply failing to institute suit.

It is also true that there must be consideration to extend a note. *Holmes* v. *Thompson*, 240 Ark. 818, 402 S.W. 2d 400, and cases cited therein. Not only do we find no evidence of a written extension, but likewise, we find no testimony indicating that a valid consideration was paid for any alleged extension. *Holmes* v. *Thompson, supra,* holds that a payment of interest which is past due is not sufficient consideration for a supplementary contract.

Finally, it is urged that the agreement is not binding upon appellant, because no representative of the bank signed the agreement.    A sufficient answer to this argument is that both parties acted under and in accordance with the agreement.    The proof reflects that the bank deducted the interest due on the Gaskin-Jackson note before sending the balance of interest on the certificate of deposit to Scott.    Scott testified that the first interest check that he received on the certificate of deposit was for $600.00, but he admitted that in July of 1966 he received only $229.00.    From the record on cross-examination:

"Q.   Do you know why you received only two hundred, twenty-nine?

A.   It was subtracted from the interest that Gaskin was supposed to pay is what I presume, now.    It was the difference is what I think; I think that is where it come from.    We have letters on it; I think that is where it come from.

Q.   I see.    The interest from your CD was used to pay the interest on this note, and they sent you the balance; is that correct?

A.   What was coming back to me, that is what they sent me.

Q.   Coming back to you from what?

A.   From the certificate of deposit, I imagine. We have the records, receipts and everything on it.

Q.   Coming back to you from the certificate of deposit after something had been deducted. What was deducted?

A.   I don't know.

Q. Well, I will hand you this letter and maybe it will refresh your memory.

\* \* \*

A. This is interest the CD earned; all right. The note earned $405.16, and a check was sent to me, $229.42.

Q. So they deducted something from your CD earnings?

A. Yes, sir.

Q. And what was that?

A. That was interest on the CD."

The letter from Conyers to Scott, referred to in the above testimony, states:

"We are deducting the interest the Gaskin-Jackson note earned from the interest your certificate of deposit earned and are enclosing our check for the difference.

| Int. your C.D. earned | $634.58 |
|---|---|
| Int. Gaskin & Jackson note earned | 405.16 |
| Our check enclosed | 229.42" |

Accordingly, it seems clear enough that Scott knew that a large part of his interest check was being used to pay the interest on the Gaskin-Jackson note, and it is also interesting to note that when he subsequently filed his complaint against the bank for $15,000.00 (representing the amount he contended to be due under the certificate of deposit) his prayer for relief did not include a return of his $405.16.

Summarizing, we think the evidence, particularly the actions and testimony of Scott, justified the Chancellor in holding that Scott was aware that a new note was being executed, with the substitution of Jackson for Mason, and, under this evidence, there was no error in decreeing reformation of the contract.

Affirmed.

WARD, J., not participating.