BIRCH-BROOK, INC., TRUSTEE *v.* WILLIAM T.
RAGLAND, JR., ET AL AND THOMAS
ENGINEERING COMPANY

5-6010                                485 S.W. 2d 225

Opinion delivered October 9, 1972

*Darrell D. Dover* and *House, Holmes & Jewell,* for appellant.

*Stubblefield & Matthews,* for appellees.

CARLETON HARRIS, Chief Justice. The pertinent facts in this case are not in dispute. In July, 1965, appellant, Birch-Brook, Inc., Trustee, an Arkansas Corporation, purchased the parcel of land in Pulaski County which is involved in this litigation (referred to in the record as "Tract B"). Appellees are heirs and devisees of the Miller and Ragland families. The sale price was $310,000, payable $50,000 in cash and $260,000 over an eight year period according to the terms of a promissory note secured by a vendor's lien on the property. It is undisputed that up to the time of the delivery of the deed, the making of the down payment, and the delivery of the aforementioned note, both appellant and appellees were under the impression that Tract B contained 89.293 acres. This belief was occasioned by a sur-

vey prepared by Thomas Engineering Co., Inc., which bore a notation that the tract contained the above mentioned acreage. It is also undisputed that this figure was in error and that the tract of land actually contained only 81.55 acres, being 7.743 acres less than the figure used in the survey. Nearly five years after the delivery of the deed, appellant, a real estate firm, and trustee and agent for a group of real estate investors and developers, instituted suit in the Pulaski Chancery Court asserting the shortage of acreage and seeking reformation of the deed and note so as to allow appellant an abatement in the agreed purchase price. After the filing of answers by the appellees, who also cross-complained against Thomas Engineering Company seeking judgment over in favor of appellees in case appellant should recover any sum against them,[1] and the amending of various pleadings, the case proceeded to trial and at the conclusion thereof, the court rendered its opinion denying relief to appellant and dismissing its complaint. Because of this finding, there was no necessity to rule on the statute of limitations issue raised by Thomas. From the decree so entered, appellant brings this appeal. For reversal, it is first asserted that the trial court erred in holding that the transaction was a sale "in gross" and not a sale by the acre. It is then contended that the mutual mistake as to quantity was so great as to entitle appellant to reformation and abatement as a matter of law and the lower court erred in holding to the contrary. We proceed to a discussion of these points.

Mr. Byron R. Morse, a Vice President of Birch-Brook, Inc., testified that the company learned that the tract of land here in controversy was for sale in the fall of 1964. Company officials contacted Mr. Jack Farris of Little Rock, knowing that he generally represented the interests of the Miller-Ragland estate. The company was not aware of the acreage of the property but learned that it had not been approved for sale at any particular figure. Morse stated that Farris said that though no definite figure could be given, he would recommend to the Raglands the sale at somewhere around $3.000 to $4.000 an acre. Mr. Morse and Mr. Rector, of Rector, Phillips, Morse, Inc., had walked over the property and knew it fronted on Highway 70. The witness testified that they considered a fair

[1]Thomas denied the allegations and pleaded the statute of limitations.

market value to be $10,000 per acre for 10 acres fronting on the highway and about $3,000 per acre for the remainder of the tract; however, when first contacting Farris they were only interested in the 10 acres as shopping center property. Subsequently, they were furnished a copy of the survey and reached the conclusion that the total value was about $340,000. Morse said that it then became a proposition of "horse trading" for the best price obtainable; that appellant initially offered $150,000 for the entire tract, counter offer by Farris for $335,000, and that finally the $310,000 sale price was agreed upon, the different prices resulting from various circumstances such as who would pay for sewers, etc. He said that at all times they had access to the survey, and had a copy of it prior to making an offer. The survey described the property by metes and bounds and was correct, though it is agreed that the figure of 89.293 acres for tract "B" appearing near the upper left hand corner was incorrect, and that the property was actually short in the amount of 7.74 acres. The metes and bounds description contained in both the deed and note concluded with the words "containing 89.293 acres, more or less".

Morse testified that the error was first discovered in the fall of 1969. The testimony of Jack Farris was in accord with that of Morse, both stating that in reaching the total price they discussed the total number of acres involved (as shown by the survey) and he said there were back and forth offers and counter-offers before the sale price was agreed upon. Arthur H. Thomas, a registered professional engineer, testified that his firm made the survey. He said that it was first delivered in July, 1964, and a copy transmitted to Mr. Farris in August, 1964. One of the employees of the company made the error, Thomas personally having nothing to do with making that computation. The witness said the error was simply in the computation of acreage, and that the dimensions and bearings shown on the survey were correct, and there is no dispute as to this fact. He said that the error was first discovered by him in October, 1969, when he received a letter from Farris asking him to check the survey.

William Trent Ragland, Jr., a resident of Raleigh, North Carolina, stated that he had only seen the tract of land one time in the past twenty years. The witness

testified that in 1962 members of the family decided they would like to dispose of their property and considered that the first step was to have a map prepared in order to determine what they owned: Jack Farris, who had handled the family's real estate business in Arkansas for many years, was contacted. Mr. Ragland never had any direct communication with the buyer of the lands and he said that Mr. Farris never communicated any offer to buy the land in question at the rate of so many dollars per acre for so many acres. He had no personal knowledge of the acreage contained.

Appellant emphasizes that the testimony of both Morse and Farris contain several references to the acreage, and that there are references to the value per acre. We attach no particular significance to that fact however, for in any land transaction involving a large tract of land to be purchased for commercial purposes, it would seem that acreage would be mentioned and in arriving at a price, an approximation of acreage would be considered. But we agree with the chancellor that there is no evidence that the price agreed upon and the consummation of the sale were based on a recited value per acre for an exact number of acres expressly represented to be contained in the tract. When asked how appellant reached its computation of the value of the property, Mr. Morse replied that the 10 acres in mind for the shopping center would amount to $100,000 and that the back, or industrial acreage, would amount to about $3,000 per acre or a total of $240,000, making a grand total of $340,000. The record then reveals the following:

"Q. So then it was a proposition of horse trading for the best price you could get from there down.

A. That's correct. That's correct. Naturally, we made a lower offer than that. ***

Q. So you and Mr. Farris started off some few thousands of dollars apart and then tried to meet in the middle, is that correct?

A. That is correct.

Q. So really your negotiations in the end were a

negotiation as to value as opposed to acres involved, weren't they?

A. Well they ended up in that particular light."

It could be that appellant and the purchasers it represented considered that they were buying lands by the acre but the evidence is not sufficient to support this argument. Not only is there a failure of proof in that respect but the record is likewise deficient in proof that appellees intended or agreed to a sale by the acre. The owners were never asked to warrant the amount of acreage, and the negotiations appear to have been based entirely upon price of the total acreage. Of course, the burden of proof is upon the one who seeks reformation to establish his right to it by clear, convincing, and decisive evidence. In *Dickson* v. *Wolfe*, 235 Ark. 855, 362 S.W. 2d 427, this court stated:

"In explaining the meaning of the rule of 'the proof must be clear, unequivocal and decisive', the court said in *Hicks, Special Adms.* v. *Rankins,* 214 Ark. 77: '. . . in the early American case, October term 1830, *United States* v. *Munroe,* 5 Mason's Rep. 577, Fed. Cas. No. 15,835, Judge Story, speaking for the court, said: "In cases of asserted mistake in written instruments, it is not denied that a court of equity has authority to reform the instrument. But such a court is very slow in exerting such an authority, and it requires the strongest and clearest evidence to establish the mistake. It is not sufficient that there may be some reason to presume a mistake. The evidence must be clear, unequivocal and decisive; not evidence which hangs equal, or nearly in equilibrio."

The evidence necessary to impeach the solemn recitations of the deed must be clear and convincing. As was said in *Bevens* v. *Brown,* 196 Ark. 1177, 120 S.W. 2d 574: 'It must be so clear that reasonable minds will have no doubt that such an agreement was executed. It must be so convincing that serious argument cannot be urged against it by reasonable people.' Tested in the light of this rule, we do not believe the purported agreement should have been accorded that high degree of verity which must attach to alleged verbal re-

servations or conditions in order to overthrow solemn recitals of a deed. Business transactions must have finality. Conveyances must not be exposed to the caprice of parol, nor explained away by less than that *quantum* of evidence which essentially attains the dignity of clarity, impressing convictions."

Of course, when the parties speak of reformation of the contract, the reference is to the note and deed, and not negotiations leading up to the execution of those instruments. In *Leonard* v. *Wood*, 233 Ark. 769, 348 S.W. 2d 696, we pointed out the distinction between a sale by the acre and a sale in gross, stating:

"It is well settled that the mention of quantity of acres after a certain description of the subject by metes and bounds, or by other known specifications, is but a matter of description, and does not amount to any covenant or afford grounds for the breach of any of the usual covenants, though the quantity fall short of the given amount. When the vendor conveys for a specified price a tract of land which is described by metes and bounds or otherwise, with the words added containing a specified number of acres, more or less, this upon the face of the contract is a contract not by the acre but in gross, and does not by implication warrant the quantity. In such event, should there be a deficiency in the quantity, the right of relief for such deficiency is founded upon fraud, misrepresentation or gross mistake."

Seven earlier Arkansas cases are then cited to this effect.

Nor do we agree with appellant as to its second point. The acreage shortage, as previously stated, amounted to 7.743 acres and appellant argues that this shortage amounted to an overcharge in money of $26,881.52 (arriving at this amount by dividing the purchase price of $310,000 by 89.293, the number of acres mentioned in the deed).[2] Accordingly, the appellant states that unless this

---

[2]This computation would seem to overlook the fact that 10 acres of this tract were given a value in price of approximately one-third of the value of the total acreage.

court holds that this was only a "slight" or "trifling" error, the trial court should be reversed and the relief prayed for granted. We do not agree, nor do we think that the cases cited by appellant are controlling. Some of these cases are distinguished in *Hays* v. *Hays*, 190 Ark. 751, 81 S.W. 2d 926. In this case, the question presented was whether a shortage of approximately 15% between the acreage conveyed and the estimated acreage was of sufficient magnitude to warrant, as a matter of law, a finding that it constituted a gross mistake. In concluding that it did not, this court cited *Gilbertson* v. *Clark*, 175 Ark. 1118, 1 S.W. 2d 823, where the shortage was definitely ascertained to be more than 25% of the total acreage conveyed. In *Gilbertson* we said:

> "It cannot be said in this case that the difference between the actual and estimated quantity of acres is so gross as to conclusively warrant a finding that the parties would not have contracted had the shortage been known[3] It is true that the price was considerable, but, when the attending circumstances are considered, it is evident that the quantity of acres was not the controlling factor in the premises."

Then, in *Hays* we added:

> "Moreover, it is certain that the law does not look solely to the quantity of the shortage as the criterion in allowing to the purchaser compensation therefor, but it also takes into account all other pertinent facts and circumstances tending to show the intentions and purposes of the parties in effecting the sale and purchase, and determines therefrom whether or not the mistake was of such magnitude and importance as to warrant the court in saying that the contract would not have been consummated if both parties had known the facts.

---

[3] Other Arkansas cases cited by appellees which have denied an abatement in the agreed price because of deficiency in acreage are: *Mobbs* v. *Burrow*, 112 Ark. 134, 165 S.W. 269 (1914), (deficiency of 53 acres out of 564.85 acres); *Daoust* v. *Sharum*, 163 Ark. 662, 260 S.W. 709 (1924). (deficiency of 22 acres out of 320 acres); *Gilbertson* v. *Clark*, 175 Ark. 1118, 1 S.W. 2d 823 (1928) (deficiency of 19 acres out of 71 acres); *Bell* v. *State National Bank*, 158 Ark. 640, 239 S.W. 2d 17 (1952), (deficiency of 94 acres out of 1,120 acres); *Young* v. *Bradshaw*, 224 Ark. 467, 274 S.W. 2d 466 (1955), (deficiency of 73 acres out of 200 acres).

When the facts and circumstances of this case are considered in the light of the rule just stated, it is apparent that the quantity of land conveyed by appellee to appellant was not of controlling importance. Appellant's information in reference to the location, improvements and fertility of the lands admittedly was equal to that possessed by appellee, and we doubt not but that this contract of purchase or sale would have been consummated between these parties irrespective of the subsequent ascertained shortage."

The language just quoted is *apropos* to the case now before us. Here the shortage amounted to approximately 8.6% (7.743 acres) and the testimony does not justify a conclusion that the parties would not have contracted if the shortage had been known. The proof makes clear that the initial interest was occasioned by the desire to build a shopping center. It is also true that appellant's information as to the size of the tract appeared to be equal to that possessed by appellees' agent and greater than that of appellees themselves. We agree with the chancellor that the acreage deficiency was not a gross mistake as a matter of law, nor a gross mistake as a matter of fact when all the circumstances are considered. Certainly, there is no clear, convincing, and decisive proof that would justify reformation of the deed and note. That being true, appellant cannot prevail.

Affirmed.

FOGLEMAN, J., not participating.