Leo THOMPSON *v.* ARKANSAS SOCIAL SERVICES

83-246                                            669 S.W.2d 878

Supreme Court of Arkansas
Opinion delivered May 7, 1984
[Rehearing denied May 7, 1984.*]

*PURTLE, J., would grant rehearing.

370

, *David J. Manley*, Legal Services of Arkansas, for appellant.

*Breck G. Hopkins*, and *Judieth P. Balentine*, for appellee.

P. A. HOLLINGSWORTH, Justice. This case involves the termination of appellant's parental rights in his three year old son and the constitutionality of Ark. Stat. Ann. § 56-128 (Supp. 1983).

When the child, Jonathan, was less than a month old, a dispute over his custody arose. Subsequently, the child was determined to be dependent neglected and was placed in the foster care program. After several hearings in Miller County Juvenile Court, the appellee, Arkansas Social Services, filed a petition to terminate the parental rights of the appellant Leo Thompson and his wife Donna and place the child for adoption. The Miller County Probate Court granted the petition. This appeal is from that order.

The appellant raises three points on appeal. First he contends that the lower court's findings of fact and conclusions of law were clearly erroneous. In his other two points, he challenges the constitutionality of the of the statute which provided the basis for the action on both substantive due process and vagueness grounds. We will address the points in that order.

The trial court's findings of fact were that the child was born to Donna Faye Harrington with no father listed on the birth certificate. The mother married the appellant approximately four months after the child was born. The child was placed in the custody of the appellee after an incident investigated by the Texarkana Police and SCAN relating to a dispute between a babysitter and the mother as to custody of the child. Supervised visitation and home visits with some overnight and weekend visits were allowed between Donna and Leo and their son. The judge stated:

> Numerous problems developed during this visitation period including problems with Donna and Leo complying with requests for administering the medication to the juvenile and feeding the juvenile foods necessary to his medical needs.

The appellant regularly attended the visitation at the appellee's offices. Donna attended infrequently. The child

has been hospitalized for diarrhea, suffered from a thrush infection and is being treated on an ongoing basis by the Developmental Clinic of Arkansas Children's Hospital. The child has been found to have delayed motor development and has needed specialized therapy. He is presently enrolled in the Special Education Center. SCAN and the appellee provided a lay therapist to work with the appellant and his wife; psychological evaluations for the mother; counseling attempts with the mother were unsuccessful; case plans were developed for the mother; transportation to the hospital was provided the parents when the child was ill; and efforts were made for the mother and appellant to visit other special education programs to assist them in understanding their child's needs. The Juvenile Court found that there has occurred no material change of circumstances sufficient to warrant return of the custody of the minor (child) to his mother and putative father, and that it is in the best interest and welfare of the juvenile that his custody remain in Arkansas Social Services.

The Court's conclusions of law were that the above recited facts:

> constitute clear and convincing facts for termination of parental rights of Donna Thompson, mother and Leo Thompson, putative father, due to the fact that they have failed and neglected without reasonable and lawful cause to provide or adjust their circumstances, conduct, or condition, so as to provide for the basic, essential, necessary physical, mental or emotional needs of the child and due to the fact that placing the child in the custody of the said Donna Thompson and Leo Thompson would raise a substantial risk of serious harm to the child due to the long standing and uncontrollable mental or emotional illness or a mental deficiency of the said Donna Thompson and Leo Thompson.

The trial court's findings were not clearly erroneous. The evidence showed that both Donna and Leo are mildly retarded, falling in the borderline category of intellectual functioning. The father completed the sixth grade in school

and the mother completed the seventh grade. They live on the money Leo makes selling blood and mowing yards, money Donna earns cleaning people's houses, and food stamps. According to testimony by a social service worker, the couple's home has no plumbing, water, or bathroom facilities, it is heated by a wood stove, and the ceiling is falling in the living room.

The custody dispute began when Donna left the baby with a woman who house she had just cleaned. The baby stayed there for nearly three weeks, visited occasionally by Donna. The woman caring for the baby called SCAN, and they picked up the child. Donna and Leo deny that they abandoned the child and claim instead that the woman was babysitting for them and then refused to return their baby.

After the appellee had custody of the child, the parents were allowed supervised visitation. During the visits when the couple was allowed to care for their son, they demonstrated an inability to understand the baby's needs by failing to feed him the proper foods or give him proper medication. After nearly two years of working with SCAN and the appellee, the couple had not improved. The baby, however, has improved during the time spent in foster care out of the home and shows promise, with special care, of leading a near normal life. Although the appellant obviously loves his son, that is not enough. The best interests of the child are what this Court, the juvenile court and the probate court must be concerned with and the evidence is clear and convincing and supports the probate judge's finding that the child's needs would be better met out of the home.

The appellant's second and third points deal with the constitutionality of the statute. In order to establish standing, a party must demonstrate that he is possessed of a right which the statute infringes and that he is within the class of persons affected by the statute. 16 C.J.S. *Constitutional Law* § 76 p. 226 (1956). The statute being challenged here deals with the termination of parental rights. Although the appellant is not listed on the birth certificate as the father of Jonathan and was not married to Donna when the child was born, this does not deny his

parenthood, as "parent" has been defined as "one who generates a child." 59 Am Jur 2d *Parent and Child* § 2 p. 84 (1971).

> The word "parent" has been held to include the father of a statutorily legitimated child born of a void marriage but it may or may not include the father of an illegitimate child. . . .There are two classes of parents in the eyes of the law: natural parents and adopting parents. Consequently, the relation of parent and child may exists as a natural fact, but not as a legal relationship, or vice verse.

59 Am Jur 2d *Parent and Child* §§ 2 and 5 (1971).

In response to a request for admission during the discovery phase of this case, the appellee admitted that the appellant is the father of Johnathan. In addition, during the hearing on this case, the appellant testified that Jonathan is his son. Since neither party questions the appellant's status and since the evidence indicates that Jonathan is his son, the appellant has standing to challenge the statute.

The appellant's first contention is that the statute violates substantive due process. The test for subtantive due process is whether or not a compelling state interest is advanced by the statute and whether the statute is the least restrictive method available to carry out this state interest. In addition, the child's best interests are of paramount importance. Ark. Stat. Ann. § 56-128 lists the conditions which permit a court to terminate a party's parental rights. The only provisions of the statute affecting the appellant, and therefore the only provisions he has standing to challenge are (F) (1) and (H), the two sections found to be grounds for termination of appellant's rights by the trial court in its order. Those provisions are:

> (F) Placing the child in the custody of the parent would raise a substantial risk of serious harm to the child; provided however before grounds may be established under this subsection, the court must be satisfied that the parents have received for a period up to six (6)

months in the discretion of the court, from the Division of Social Services remedial support services designed to reunite the child and the parents, and such services have failed to substantially reduce the risk of harm to the child. In determining the risk the court may consider, but shall not be deemed to be limited to one or more of the following:

1.   Longstanding and uncontrollable mental or emotional illness or mental deficiency of the parent;

. . .

(H) The parent has failed or neglected without reasonable and lawful cause to provide or to adjust his circumstances, conduct, or condition so as to provide for the basic, essential and necessary physical, mental, or emotional needs of the child for a period of one (1) year immediately preceeding the filing of the petition. . . .

In *Davis* v. *Smith,* 266 Ark. 112, 583 S.W.2d 37 (1979), we held that an earlier version of this statute was unconstitutionally vague. In that case we said:

The concern of this court for the preservation of these [parental] rights has been expressed over a long period of time. . .[W]e recognized the rights of parents of good moral character, however poor and humble they might be, if able to support their child in their own style of life, not as a cardinal principle of law and nature, to be deprived of parental privileges, except when urgently necessary to afford the child reasonable protection. Parental rights and the integrity of the family unit have always been a concern of this state and their protection regarded as a proper function of the court. They have been classified as essential rights, basic civil rights, and personal rights more precious than property rights. They have been said to be fundamental rights. . . .Certainly there reamins no lingering doubt about the fact that the rights of parents to the care, custody and upbringing of their children are the subject of cons-

titutional protection on both due process and equal protection standards. Parental rights are not, however, beyond limitation in the public interest. The state's constitutional interest extends to the welfare of the child. Parental rights are not immune from interference by the state in its role of parens patriae.

The statute is also not vague. For a statute to avoid being vague under due process standards, it must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden and it must not be so vague and standardless that it leaves judges free to decide, without any legally fixed standards, what is prohibited and what is not on a case by case basis. *Davis, supra.*

In *Davis,* we decided that a statute terminating parental rights should be scrutinized with greater flexibility than that accorded criminal statutes. We explained:

> This is because any parent should have some basic understanding of his obligations to his children, but many cannot be as alert to and aware of, prevailing practices basic to establishment of standards as those engaging in business would likely be to settled and well understood standards and practices. . .Flexibility and reasonable breadth, rather than meticulous specificity or great exactitude, in a statute are permissible, so long as its reach is clearly delineated in words of common understanding. . .It is not necessary that all kinds of conduct falling within the reach of the statute be particularized. A statute is not to be struck down as vague only because marginal cases could be put where doubts might arise.

The appellant's argument turns on the lack of a clear definition of the terms "mental illness" and "emotional illness" and the absence of what the "basic, essential and necessary needs" of a child are. We said in *Davis, supra,* that mathematical certainty is not required in a statute just so the language is capable of common understanding. Similar language has been upheld by courts in other jurisdictions. See *The Matter of N. Children,* 107 Misc. 2d 763, 435 NYS2d

1018 (1981); *In re Sylvia M.*, 82 A.D.2d 217, 443 NYS2d 214 (1981); *In re Doe*, 465 A.2d 924, (N.H., 1983); *Matter of Atkins*, 112 Mich. App. 528, 316 N.W.2d 477 (1982). We agree with the appellee that, since the particular disabilities of parents are diverse, it would be impossible to catalogue each disability, and the statute must be cast in broad enough language to encompass all proscribed behavior. We follow the language used by the Connecticut court in *State* v. *Anonymous*, 179 Conn. 155, 425 A.2d 939, 945 (1979) where they said:

> The conduct that is proscribed, while not enumerated specifically, is delineated as that resulting from "physical or mental incapability" or "conditions attributable to parental habits, misconduct or neglect." It is true that these somewhat general phrases encompass a wide variety of conduct, but the process of parenting itself is multi-faceted and encompasses all of life's activities. In view of the diversity of human nature, backgrounds and capabilities, and the differing aspirations of families in our society, it would be impossible to delineate specific conduct as acceptable or unacceptable. What might be totally unacceptable parental behavior in one situation (the deprivation of certain material goods) might be an unfortunate but unavoidable fact of life in a different family situation.

The statute is constitutional.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice. Adoption of a child over the objection of a natural parent is a most serious matter. We have adopted a rule in such cases which states that the facts justifying such action must be established by clear and convincing evidence that the parent has failed significantly and without justifiable cause to communicate with the child or to provide for his care and support. *Harper* v. *Caskin*, 265 Ark. 558, 580 S.W.2d 176 (1979). In *Harper* the adoption was rejected because it had not been shown that the father had

conducted himself in such a manner as to deprive him of his parental rights. Natural rights of parents should not be passed over lightly. The integrity of the natural relation of parent and child must be given strong consideration. The determination to sever such relationship, being in derogation of the natural and common law, must be determined from extrinsic evidence before the judge. 2 Am. Jur. 2d Adoption § 60.

Adoption deprives the child and the parent of their relationship which nature bestowed upon them. It is more drastic and permanent than temporary custody. In temporary custody cases the parent and perhaps the child usually harbor and cherish the idea that they will at some time in the future be reunited. Adoption banishes such hope, and even if slowly, nevertheless destroys that love and affection usually existing between a child and his parent. The relationship of a parent and child should never be terminated unless there are compelling reasons for doing so.

I think the trial court and the Arkansas Social Services acted too hastily in requiring the father and son to forever relinquish their natural relationship. Before requiring any parent to absolutely relinquish and abandon his child without hope or expectation of ever again resuming the relationship, I would require the state to walk an extra mile.

How can it be said with any degree of certainty that it is in the best interest of this child to sever his natural relationship with his father? The child could not express his feelings at his tender age. How do we know how much he loves his father? Does he realize he most likely will never see his natural mother and father again? As I understood the record this child was living with his father in the house where the father was born and raised. Not every citizen of this state can afford a three bedroom air conditioned brick home in Little Rock. The pioneers of this state no doubt survived in less comfortable circumstances than they desired. I feel certain this father would much rather live in a modern home but his circumstances in life do not at this time allow him to do so. If we are to believe it is in the best interest of a child to transplant him into what we perceive to

be a better environment, then we open the gate to the highest bidder. Children should never be for sale.

It is my opinion that the Social Services should have done more to encourage and teach these parents how to be good parents in their circumstances. The child was taken from the parents when he was only one month old. Before he was two years old the court had taken him from his parents under the allegation that the parents were "unfit" to properly care for him and that he was entitled to the love and affection of a normal home. How did the Social Services determine the child was not loved or that the parents were unfit? By allowing the parents to visit with their child under close scrutiny and apparently spasmodically. It is obvious from the record that the foster mother was as unpredictable as the natural mother. This child should have been placed in another foster home or returned to the natural parents under close supervision, in my opinion. I agree with appellant that the remedial support services designed to reunite this child and his parents as required by Ark. Stat. Ann. § 56-128(F) (Supp. 1983) were not provided in this case. *A. B.* v. *Arkansas Social Services,* 273 Ark. 261, 620 S.W.2d 271 (1981).

I would not grant the petition without proof of further rehabilitation attempts by the Social Services. In my opinion the proof, as it relates to the father, is not clear and convincing that this father has failed significantly without any justifiable cause to support and care for the child. The fact that a parent may be poor and ignorant is not by itself grounds for permanently destroying their natural relationship. It seems to me there must be more than this record reveals before a child and his parents are separated forever.