Ted Martin AKIN and Gloria D. Akin *v.* The FIRST
NATIONAL BANK of Conway

CA 87-377                                         758 S.W.2d 14

Court of Appeals of Arkansas
En Banc
Opinion delivered October 19, 1988
[Rehearing denied November 23, 1988.*]

*Corbin, C.J., and Mayfield, J., would grant rehearing.

342

*Wright, Lindsey & Jennings*, for appellants.

*Henry & Henry*, for appellee.

JOHN E. JENNINGS, Judge. This suit was brought by First National Bank of Conway, the appellee here, against Ted Akin, appellant here, and William Yarbrough to foreclose a mortgage on a home in Guy, Arkansas. The lawsuit also sought reformation of a guaranty executed by Akin and a note to the bank executed by Yarbrough. Yarbrough failed to answer the bank's complaint. The chancellor reformed both the guaranty and the note, and awarded judgment to the bank as against Akin.

On appeal Akin argues that the court erred in reforming the guaranty, erred in reforming the note, and erred in exercising personal jurisdiction over him. Because we find merit in the second argument only, we affirm the chancellor's decree, as modified.

The only two witnesses at trial were Tommy Sanson, a vice-president for the bank, and Larry Grady, an attorney for the bank. Neither Akin, a resident of Dallas, nor Yarbrough, apparently a resident of Mesquite, Texas, testified. Sanson

testified that he made a loan to Yarbrough in 1980. The loan was to enable Yarbrough to buy the house at Guy from a Mr. and Mrs. Stephens. A loan application was admitted into evidence, signed by both Akin and Yarbrough. Sanson said that Yarbrough signed it in his presence, but that the application was mailed to Akin in Texas for his signature. Akin submitted a personal financial statement to the bank showing a substantial net worth. The application itself indicated that the property would be held in Yarbrough's name. Sanson testified that he talked with Akin on the telephone about the loan and Akin told him that he was going to "co-sign" and be a "co-owner" with Yarbrough. Akin told him they were in the dog business down in Texas and that they wanted the property in Guy for raising dogs. He said that Akin also told him he did not want the property in his name.

Sanson testified that he required a loan guaranty agreement to be signed by Akin and that his secretary prepared it. He said that he and Akin had discussed this by telephone. The guaranty agreement was apparently received by Akin in Texas, signed by him, and returned to the bank in Conway. It was also signed by David M. Voyles, Molly Bisson, and J.H. Yarbrough. These three parties were never served and the chancellor dismissed the lawsuit as to them.

In the instrument of guaranty, Akin, and the others, agreed to guarantee the debt of *Akin* to the bank. Sanson's testimony was that the instrument was intended to guarantee the debt of William Yarbrough and that it failed to do so only because Sanson's secretary had made a mistake. The guaranty was dated August 26, 1980.

On September 26, 1980, William Yarbrough executed a note and mortgage in favor of the bank, on the Guy property. Yarbrough also took title to the property in his name alone. Yarbrough subsequently failed to make the payments on the note to the bank and, on December 14, 1982, deeded the Guy property to Akin.

Sanson testified that he went to Dallas with the lawyer, Grady, to talk to Akin about the debt, in 1984. He said that Akin told them that he was going to pay the debt. Apparently, at this time Akin had filed for reorganization under Chapter 11 of the Bankruptcy Act. Grady corroborated Sanson's version of the

1984 meeting with Akin in Dallas. He also testified that Akin had listed this debt in his bankruptcy pleadings, showing the bank as the creditor. By the time of trial, the Guy property had been released from the bankruptcy proceeding.

At the conclusion of the testimony counsel for Akin conceded that the bank was entitled to foreclose its mortgage, but argued that the court should not enter a personal judgment against Akin.

Reformation of a written instrument is permitted in equity to show the true intent of the parties where there is a mutual mistake. *Bicknell* v. *Barnes*, 255 Ark. 697, 501 S.W.2d 761 (1973). Reformation is an equitable remedy which is available when the parties have reached a complete agreement but, through mutual mistake, the terms of their agreement are not correctly reflected in the written instrument purporting to evidence that agreement. *Delone* v. *USF&G*, 17 Ark. App. 229, 707 S.W.2d 329 (1986). The parties seeking reformation, however, must present evidence which "clearly and convincingly" warrants a finding that a mutual mistake occurred. *Bicknell, supra; Turner v. Pennington*, 7 Ark. App. 205, 646 S.W.2d 28 (1983). However, the proof need not be undisputed in order to obtain reformation. *Winkle* v. *Grand Nat'l Bank*, 267 Ark. 123, 601 S.W.2d 559 (1980). *Bicknell, supra; Turner, supra.* Although we continue to hear chancery cases *de novo*, "the test on review is not whether we are convinced that there is clear and convincing evidence [to support the] judge's findings, but whether we can say that the . . . judge was clearly wrong in his findings." ARCP Rule 52; *A.B.* v. *Arkansas Social Services*, 273 Ark. 261, 620 S.W.2d 271 (1981) (Hickman, J., dissenting). We have said that in such a case, the question we must answer on appeal is whether the chancellor's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Freeman* v. *Freeman*, 20 Ark. App. 12, 722 S.W.2d 877 (1987); *Turner, supra.* Even in reformation cases, where the burden of proof is by clear and convincing evidence, we defer to the superior position of the chancellor to evaluate the evidence. *Bicknell, supra; Turner, supra.*

When all of the evidence in the case is considered we think it reasonably clear that Akin agreed with the bank to

guarantee the debt of Yarbrough and that through the error of Sanson's secretary the instrument did not reflect the parties true intention. In *Kohn* v. *Pearson*, 282 Ark. 418, 670 S.W.2d 795 (1984), the court said, "[t]he mistake of a draftsman, whether he is one of the parties or merely a scribner, is adequate grounds for relief, provided only that the writing fails to reflect the parties true understanding," citing D. Dobbs, *Remedies* § 4.3 (1973). The fact that it was a bank employee who drafted the instrument wrong, does not render the mistake a unilateral one in a legal sense. Certainly, a guaranty agreement can be reformed. *Scott* v. *Citizens Bank of Batesville*, 245 Ark. 235, 431 S.W.2d 832 (1968). We cannot say the chancellor was clearly wrong in finding that a mutual mistake had been established by clear and convincing evidence.

However, the evidence to support the chancellor's decision to reform the note itself is clearly insufficient. Once it is accepted that Akin understood he was guaranteeing the note signed by Yarbrough, Akin's subsequent acknowledgment of the debt provides no support for an argument that the note should be reformed. Although Sanson was apparently in charge of the preparation of the note and mortgage, he offered no testimony that his secretary or any other bank employee had made a mistake in their preparation. Sanson's insistence that Akin guarantee Yarbrough's debt is inconsistent with a contention that Akin was a co-debtor.

Finally, Akin contends that the trial court erred in exercising *in personam* jurisdiction over him. Ark. Code Ann. § 16-4-101 provides that a court may exercise personal jurisdiction over a person as to a cause of action arising from that person's "transacting any business in this state." The supreme court has held that the purpose of the statute is to expand this state's personal jurisdiction over non-residents, within the limits permitted by the due process clause of the United States Constitution. *See S.D. Leasing, Inc.* v. *Al Spain and Assoc., Inc.*, 277 Ark. 178, 640 S.W.2d 451 (1982); *Nix* v. *Dunavant*, 249 Ark. 641, 460 S.W.2d 762 (1970). In order for a valid judgment to be rendered against a non-resident not served within the forum state, due process requires that certain minimum contacts exist between the non-resident and the state, such that the maintenance of the suit does not offend traditional notions of fair play and substantial

justice. *International Shoe Co.* v. *Washington,* 326 U.S. 310 (1945). The contacts with the forum state must be such that the non-resident defendant should reasonably anticipate being "haled" into an Arkansas court. *Jagitsch* v. *Commander Aviation Corp.,* 9 Ark. App. 159, 655 S.W.2d 468 (1983) (citing *World-Wide Volkswagen Corp.* v. *Woodson,* 444 U.S. 286 (1980)). A single contract can provide the basis for the exercise of jurisdiction over a non-resident defendant if there is a substantial connection between the contract and the forum state. *McGee* v. *International Life Ins. Co.,* 355 U.S. 220 (1957). Whether the "minimum contacts" requirement has been satisfied is a question of fact. *Wisconsin Brick & Block Corp.* v. *Cole, Judge,* 274 Ark. 121, 622 S.W.2d 192 (1981).

In *Jagitsch, supra,* we said that although there was no exact formula for deciding what is reasonable and fair under the circumstances five factors should be considered: The nature and quality of the contacts with the forum state; the quantity of contacts with the forum state; the relation of the cause of action to the contacts; the interest of the forum state in providing a forum for its residents; and the convenience to the parties. *Jagitsch,* 9 Ark. App. at 163, citing *Arkansas-Best Freight System, Inc.* v. *Youngblood,* 359 F. Supp. 1115 (W.D. Ark. 1973).

In the case at bar it is clear that Akin was a resident of the State of Texas. Sanson's testimony was that Akin never came to Conway and that their discussions were all by mail or phone. There was also evidence, however, that Akin signed a loan application, a financial statement, and a personal guaranty and delivered them to the bank in Conway to induce the bank to loan Yarbrough the money to buy land in Guy, Arkansas. The evidence was undisputed that Akin intended to go into business on that property and he subsequently took a deed to the property from Yarbrough. The evidence in the case, taken as a whole, provides some support for Sanson's contention that Yarbrough was merely acting as a "front" for Akin. We find no error in the trial court's factual determination that Atkin "transacted business" within the State of Arkansas. Nor do we think that the due process clause is violated by the court's exercise of *in personam* jurisdiction. Appellant could reasonably have anticipated that issues involving both the mortgage and the guaranty might

properly be litigated in the State of Arkansas, rather than the State of Texas, and we affirm the trial court on this issue.

Because we hold that it was error for the court to reform the note, we remand this case to the chancellor for the entry of an order consistent with this opinion.

Affirmed as modified.

CORBIN, C.J., COOPER and MAYFIELD, JJ., dissent.

MELVIN MAYFIELD, Judge, dissenting. I cannot agree with the majority decision in this case. To explain my view, it will be necessary to consider three points: (1) the law relative to reformation, (2) the standard by which we review the trial judge's factual determination, and (3) the evidence presented to the trial judge.

### The law relative to reformation

The majority decision states that parties seeking reformation "must present evidence which 'clearly and convincingly' warrants a finding that a mutual mistake occurred." While this statement is not incorrect, it is not as descriptive as the language actually used by the appellate courts in Arkansas. First, we note that there are two dimensions to this statement—there must have been a *mutual* mistake and this must be established by *clear* and *convincing* evidence. Second, let us consider the actual language used in some cases. In *DeLone* v. *United States Fidelity & Guaranty Co.*, 17 Ark. App. 229, 233-34, 707 S.W.2d 329 (1986), the Arkansas Court of Appeals said:

> Reformation is an equitable remedy which is available when the parties have reached a complete agreement but, through mutual mistake, the terms of their agreement are not correctly reflected in the written instrument purporting to evidence that agreement. A mutual mistake is one shared by both parties at the time their agreement is reduced to writing and it must be shown clearly and decisively that the parties intended their written agreement to say one thing and, by mistake, it expressed a different thing. *Yeargan* v. *Bank of Montgomery County*, 268 Ark. 752, 595 S.W.2d 704 (Ark. App. 1980); *Corey* v. *Mercantile Ins. Co. of America*, 205 Ark. 546, 169 S.W.2d

655 (1943). An order reforming a written instrument cannot be based upon a unilateral mistake unless there is a mistake on one side and fraud or inequitable conduct on the other. *Arnett* v. *Lillard*, 245 Ark. 939, 436 S.W.2d 106 (1969).

. . . Furthermore, reformation deals with the reforming of written instruments to conform to the intent of the parties at the time they are executed.

In *Birch-Brook, Inc.* v. *Ragland*, 253 Ark. 161, 165, 485 S.W.2d 225 (1972), the Arkansas Supreme Court quoted from a prior decision as follows:

In explaining the meaning of the rule of "the proof must be clear, unequivocal and decisive," the court said in *Hicks, Special Admx.* v. *Rankin*, 214 Ark. 77 . . . "In cases of asserted mistake in written instruments, it is not denied that a court of equity has authority to reform the instrument. But such a court is very slow in exerting such an authority, and it requires the strongest and clearest evidence to establish the mistake. It is not sufficient that there may be some reason to presume a mistake. The evidence must be clear, unequivocal and decisive; not evidence which hangs equal, or nearly in *equilibrio*."

### The standard of review

Rule 52(a) of the Arkansas Rules of Civil Procedure contains the statement that, in cases tried without a jury, "findings of fact shall not be set aside unless clearly erroneous (clearly against the preponderance of the evidence), and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." It is common knowledge that this language was taken from Rule 52 of the Federal Rules of Civil Procedure. However, the reporter's notes to our rule states that the rule "does not alter the fact that in some cases an issue must be proved by clear and convincing evidence." The majority decision in the case at bar recognizes that our standard of review is whether "the chancellor's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous" but, again, those words no not describe the appellate process as well as does the language actually used by the appellate courts.

In *RAD-Razorback Ltd.* v. *B.G. Coney Co.*, 289 Ark. 550, 553, 713 S.W.2d 462 (1986), the Arkansas Supreme Court adopted the language of the Untied States Supreme Court in *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364 (1947), that under Rule 52(a) of the Federal Rules

> A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.

Neither court was concerned, in the above cases, with the review of a trial judge's decision which required a finding based upon clear and convincing evidence. That situation has been before the Arkansas Supreme Court, however, and the test used on appeal was whether the trial judge's decision that the evidence was clear and convincing was clearly erroneous. *See Thompson* v. *Arkansas Social Services*, 282 Ark. 369, 669 S.W.2d 878 (1984); *Festinger* v. *Kantor*, 272 Ark. 411, 426-27, 616 S.W.2d 455 (1981). This is also the test used by the court in *Turner* v. *Pennington*, 7 Ark. App. 205, 646 S.W.2d 28 (1983), cited in the majority opinion. Thus, I see no reason why the meaning of "clearly erroneous" given in *RAD-Razorback Ltd., supra*, should not apply where the question is whether the trial judge's decision was based upon clear and convincing evidence.

### The evidence presented to the trial judge

As stated in the majority opinion, the only testimony presented was from Tommy Sanson, a vice-president of the appellee bank, and Larry Grady, an attorney for the appellee bank. Sanson testified that the appellant never came to Conway; that they did business over the telephone or by mail. Sanson said that, before the receipt of the guaranty agreement, it was his "understanding" the appellant would be a co-borrower with Yarbrough. He testified as follows:

> He told me he was going to co-sign and be a co-owner with William Boyd Yarbrough, who was a friend of his. He was in the dog business, the way I recall—had poodles or something like that in Texas. And, of course, him being a judge, you know, uh, not only added to the net worth on making this loan, being a judge . . . .

The guaranty agreement was signed by the appellant on August 26, 1980. Before that, on July 20, 1980, the appellant and Yarbrough both signed a loan application. Under the line on which the appellant signed it was plainly printed "Co-borrowers Signature." Although the subsequent note and mortgage was from Yarbrough only, this was not inconsistent with Sanson's "understanding." He testified:

> Mr. Akin told me on the phone — that was seven years ago — that he was going to be a co-owner of this property. They were in the dog business together down in Texas. He wanted this property up here for him to raise dogs, but did not want the title in his name.

The appellee bank contends that the guaranty agreement, which states that its purpose is to enable "Ted Martin Akin" (appellant) to obtain credit from the appellee, was supposed to have Yarbrough's name where appellant's name appeared. The appellee contends the agreement was incorrectly typed through an error made by Sanson's secretary. However, the guaranty agreement was signed by three persons in addition to the appellant. This is not inconsistent with the "understanding" Sanson said he had that appellant would be a co-borrower and co-owner of the property with Yarbrough. This is also not inconsistent with the statement Sanson says appellant made to the effect that he did not want the title to the property in his name. There is simply no evidence in the record, and none is mentioned in the majority opinion, that the appellant made any mistake in signing the guaranty agreement. There must be clear and convincing evidence of *mutual* mistake to warrant reformation of the agreement. In *Mizell* v. *Carter*, 255 Ark. 960, 504 S.W.2d 743 (1974), the court relied upon an earlier case which stated:

> Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of the evidence, but only upon a certainty of the error.

255 Ark. at 962-63.

But even if we were to indulge in probability, it seems clear to me that we would have to assume that the appellant, who the parties agree was an appellate court judge in Texas, would know what he signed. At the time the guaranty agreement was signed, it

was contemplated that appellant would be a co-borrower. There is no evidence to the contrary. All the evidence up to that point is consistent with that situation. If there was a mistake in the name of the person whose debt was to be guaranteed, there is no evidence to show it was made by the appellant.

Reformation deals with the reforming of a written agreement to make it conform to the intent of the parties at the time the agreement is executed. *DeLone* v. *United States Fidelity & Guaranty Co., supra.* Therefore, what occurred after the guaranty agreement was signed in this case is immaterial unless it sheds some light on what the agreement between the parties was at the time the guaranty agreement was signed. The appellee relies upon a conversation that Sanson and the bank's attorney, Grady, had with appellant in Dallas in 1983, about three years after the guaranty agreement was signed. They say that appellant told them that he was going to pay the debt to the appellee bank. But they also testified that the appellant told them that he had a deed to the property from Yarbrough and that he might want to retire to the property. The appellee also relies upon the fact that appellant had listed the debt to the bank when he filed a Chapter 11 bankruptcy.

Appellant's intention to pay the debt was consistent with having acquired the deed from Yarbrough. There was a debt to the appellee bank made by Yarbrough and a mortgage by him on the property to secure the debt. If appellant wanted his deed to be good, the mortgage debt would have to be paid. Likewise, appellant was required to list all claims, even potential claims, against his estate, which included the property deeded to him by Yarbrough. *See* 11 U.S.C. §§ 521, 541 and 11 U.S.C. §§ 1101 *et seq.* So, neither his statement that he was going to pay appellee nor the fact that he listed appellee's debt in his bankruptcy proceedings is inconsistent with the "understanding" Sanson had from the first—that appellant was going to be a co-borrower.

We do not need to speculate on why appellant did not sign the notes to appellee with Yarbrough. We know, however, that he did not. The majority opinion correctly reversed the trial judge's reformation of the notes because there was no agreement with appellee that appellant would sign the notes. The trial judge correctly granted judgment against Yarbrough who did not

answer and correctly foreclosed the mortgage against the property. But I would reverse the judgment against the appellant because, after reviewing the entire evidence, I am left with a definite and firm conviction that the trial judge made a mistake (was clearly erroneous) in holding that there was clear and convincing evidence that the guaranty agreement should be reformed.

CORBIN, C.J., and COOPER, J., join in this dissent.